HALE et al., Appellants,

v.

VOLUNTEERS OF AMERICA, Appellee.

[Cite as *Hale v. Volunteers of America,* 158 Ohio App.3d 415, 2004-Ohio-4508.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020839.

Decided Aug. 27, 2004.

416

Tobias, Kraus and Torchia, Sharon Sobers and Paul H. Tobias, for appellants.
Rendigs, Fry, Kiely & Dennis, L.L.P., and Felix Gora, for appellee.

SUNDERMANN, Presiding Judge.

{¶ 1} Plaintiffs-appellants Diana Hale and Carrol Sue Becker appeal the trial court's entry granting summary judgment to defendant-appellee Volunteers of America, Ohio River Valley, Inc. ("VOA") on claims for wrongful discharge and promissory estoppel. For the reasons that follow, we affirm the trial court's entry of summary judgment.

{¶ 2} Hale and Becker were employees at the Pogue Rehabilitation Center ("Pogue Center"), a residential treatment center for approximately 100 felons. The upstairs portion of the center contained a 70–bed substance-abuse halfway house, while the downstairs portion of the center housed 25 sex offenders in the New Life Program, as well as at least 15 offenders who suffered from both mental illness and drug-related problems in the Renew Program. The VOA was licensed by the Ohio Department of Rehabilitation and Corrections ("ODRC") and the Ohio Department of Alcohol and Drug Abuse to operate the Pogue Center. The Pogue Center was also audited by the American Corrections Association ("ACA").

{¶ 3} Becker was employed as a therapist for the New Life Program from March 1998 until October 20, 2000. She was responsible for intake procedures, gathering social histories when necessary, client assessments, assigned individual and group work, and record keeping. Hale was a registered nurse. She served as the sole nurse for the 100 offenders at the Pogue Center from January 26, 1999, to September 26, 2000. Her primary job duties included assessing offenders upon their entry into the Pogue Center, monitoring all medications prescribed for the offenders, providing a wellness program, conducting follow-up assessments of those offenders with chronic illnesses, assisting offenders in the acquisition of appropriate health-care resources, and assisting in medical emergencies.

{¶ 4} During Hale's and Becker's employment, the VOA had a contract under which the Biological Psychiatric Program ("BPP") at the University of Cincinnati provided psychiatric services for the 40 residents in the New Life and Renew

Programs. Dr. Susan McElroy, Dr. Neal Dunseith, Jeff Holcomb, and Lori Lovins Brusman were part of the BPP team. Dr. Purcell Taylor was the clinical director at the Pogue Center. Hale and Becker worked directly with the BPP team and Dr. Taylor.

{¶ 5} Chris Lohrman was the executive director of the VOA, with the responsibility for generally overseeing the operation of the Pogue Center. The Pogue Center also had various facility directors during Hale's and Becker's employment, including John Wallace (January 1999 to March 2000), Cameron Beavers (March 2000 to May 2000), Annabelle Matusoff (May 2000 to mid-July 2000), and Amy Orr (late July 2000 to present).

{¶ 6} Throughout their employment at the Pogue Center, Hale and Becker complained about the center's treatment of the offenders in its programs. Hale estimated that she wrote 150 memoranda to the VOA administration. She was also a vocal participant in discussions with the administration relating to the standard of care at the Pogue Center. Hale raised issues with facility directors John Wallace and Amy Orr and interim directors Cameron Beavers and Annabelle Matusoff. Becker wrote incident reports, tried to help offenders with their grievances, and complained to John Wallace and Amy Orr.

{¶ 7} Many of Hale's and Becker's complaints stemmed from the division between the professional staff and the nonprofessional staff working at the center. Hale and Becker complained that the nonprofessional staff, which consisted mainly of house managers, was untrained, uneducated, and unresponsive to the offenders' needs. Hale and Becker began complaining about the quality of the house managers early on in their employment at the Pogue Center. Both women complained that the house managers failed to supervise the offenders, verbally abused the offenders, refused to give offenders their medication as a form of punishment, and tore up offenders' grievance forms. They also complained that house managers would take agency cars, leaving the professional employees with the responsibility of transporting offenders in their own cars. Hale additionally complained about a house manager whom she had witnessed smoking marijuana with another offender, about house managers bringing pornography into the center, and about house managers allowing offenders to smuggle prostitutes into the center.

{¶ 8} In addition to these complaints, Hale complained about a variety of medication issues throughout her employment at the Pogue Center, including problems relating to the storage, administration, and charting of offenders' medications, the difficulty in obtaining medications for offenders, and missing medications. Hale also complained about the center's inability to maintain an accurate census of its offenders, the lack of accommodations for handicapped offenders, as well as for offenders on special diets, and the difficulty of obtaining

physical examinations for the offenders. Moreover, both women repeatedly complained to the administration that the center was so understaffed that they had difficulty completing their work.

{¶ 9} In July 2000, Hale and Becker found questionnaires in their mailboxes from the ODRC requesting information about the mental-health and medical services offered at the Pogue Center. Hale and Becker filled out the questionnaires and sent their responses to the ODRC. In her responses, Hale discussed her day-to-day problems at the center, including her difficulty in obtaining medication for offenders who arrived at the center with no medication, her problems with parole officers, and her problems with obtaining physical examinations for the residents. She commented not only that the center was underfunded, but also that its employees were overworked and that she herself felt "overwhelmed and struggled to adequately care for the needs of the clients." She concluded her responses by stating that many of the issues were internal and that she would continue to bring them to the attention of the administration at the center.

{¶ 10} In her responses, Becker discussed problems she had in helping the offenders obtain medication, including her struggle to help the offenders get Medicaid cards. She concluded her letter by stating, "Any assistance you [the ODRC] can provide for th[ese] * * * issues would be greatly appreciated as it becomes more and more difficult to acquire prescription medication for those residents. Also, without a Medicaid card, the VOA cannot receive Medicaid reimbursement for any drug/alcohol treatment."

{¶ 11} On or around July 20, 2000, Orr, who had previously served as Becker's supervisor in the New Life Program, became the facility director for the center. Stephanie Strausbaugh was promoted to be the interim director of the New Life Program, thus becoming Becker's supervisor. Around the same time, Hale showed her responses to the ODRC survey to Dr. McElroy in a New Life treatment-team meeting. Orr asked Dr. McElroy to review the responses. After looking at the responses, Orr became very upset and left the meeting. A copy of the responses was later placed in Hale's personnel file. It is unclear whether the administration knew that Becker had sent her responses to the ODRC. Becker herself could not recall if anyone at the VOA knew about her responses to the questionnaire.

{¶ 12} On July 30, 2000, Orr sent a memorandum to all the employees at the center. The memorandum stated that "[e]ffective immediately, all letters, memos, and notes that are written on VOA stationery must be reviewed by [Orr] before being sent U.S. Mail, Inter-officer [sic] mail, or faxed." That same day, Orr spoke with Hale about the memorandum. Orr asked Hale whether she had received the memorandum and whether she intended to comply with the new

policy. Hale stated that she would adhere to the policy. Orr told Hale that she was upset that Hale had not shown her the questionnaire responses that Hale had sent to the ODRC. Hale told Orr that because she was not the facility director at that time, she did not feel that she needed to provide her with a copy of the responses. She also told Orr that she had not written the responses on VOA stationery.

{¶ 13} Several days later, Orr sent a second memorandum to all employees, which stated the following: "Revision to memo regarding out-going correspondences from Pogue. All letters, memos, and notes written on VOA stationery must be reviewed by me prior to being sent; this review must also occur on any correspondence regarding VOA matters whether or not on VOA stationary."

{¶ 14} During this same time, Hale was written up for failing to treat an offender, James B. On July 26, Kathy Price, who worked as both the operations manager and an administrative assistant, prepared a memorandum regarding the incident. In the memorandum, Price stated that she had sent an offender to see Hale for a pus-infected finger. Price stated that Hale, who had been eating in the dining room, refused to treat the offender, so she called Annabelle Matusoff, a VOA vice president, to look at the offender's finger. Matusoff ordered the resident sent to the emergency room.

{¶ 15} On July 29, 2000, Hale used a VOA credit card to purchase a one-month prescription for an offender named Mark S. The prescription cost $322.79. The agency had an $8,500 medication fund sponsored by the ODRC. VOA policy provided the following: "Any resident who requires immediate, essential medication, as determined by a licensed physician, and is unable to obtain this medication by any other means shall be provided an initial two weeks' supply through VOA funds. This determination will be made by the VOA nurse, the clinical program director, and/or the facility director. Additional medication needs will be assessed on a case-by-case basis by the nurse or facility director."

{¶ 16} Hale stated that she was aware of the VOA policy at the time that she filled the prescription, that Lohrman had previously told her that the fund was to be used only for medication as a last resort and only for an emergency, and that she had received a memorandum about the fund in March 2000. After Hale had filled the prescription, Orr told Hale that she had filled the prescription in violation of VOA policy. Orr ordered Hale to contact Mark S immediately and to tell him that because he was employed, he was going to have to provide reimbursement for the prescription. Hale stated that she would not do this. As a result, Hale was written up for failing to comply with agency policies for medication and medical assistance. Orr also prepared a memorandum regarding the incident.

{¶ 17} A corrective-action form dated September 18, 2000, was subsequently placed in Hale's personnel file. In August, Hale had been relieved of her on-call responsibilities. Medical emergencies were then reported to Dr. Taylor, the clinical director, and to Price. On September 19, Hale was asked to surrender her agency credit card.

{¶ 18} In the meantime, Becker had received a voice-mail message from Strausbaugh on September 8, indicating that an internal audit of her client files would take place on September 15. Strausbaugh met with Becker on September 13 regarding the audit and the importance of Becker's compliance with the agency's standards for completing paperwork. On September 15, Becker told Strausbaugh that she had not had time to complete the four files Strausbaugh was going to audit. During her audit, Strausbaugh discovered that Becker had failed to review and update two treatment plans, which were overdue by one year, and that Becker had also failed to complete monthly progress reports.

{¶ 19} On September 20, 2000, 20 individuals from the Pogue Center, including Becker, Hale, Orr, Strausbaugh, and Kevin Embry, another therapist in the New Life Program, attended a retreat in downtown Cincinnati. The retreat was organized by Robert Harris, of the National Council for Community and Justice. At the beginning of the retreat, Harris stated several ground rules for the participants, including a request for confidentiality, amnesty, and full participation. Harris further explained that any personal thoughts and opinions expressed at the retreat were to stay in the room and that the participants were to be forgiving of one another.

{¶ 20} During the retreat, Becker raised issues related to staffing and transportation at the center. Becker stated that she was disappointed that Lohrman had not become more involved at the center and that she had never been treated more disrespectfully than during her employment at the center. According to Becker and Hale, Orr stood up and stated that anyone who did not like the VOA could leave. When Becker stated that she would leave if Orr gave her a letter of recommendation, Orr stated that she would give Becker the letter only if she turned in a notice of resignation. When Becker asked why she could not have the letter before then, Orr stated that she did not trust Becker.

{¶ 21} At some point, Embry stood up and said that Orr was being disrespectful to Becker. He made several strong statements questioning Orr's qualifications to be director at the Pogue Center. He also stated that unless things changed at the center, it needed to be closed down. Becker agreed with Embry's comments.

{¶ 22} Sometime after this exchange, Hale raised her hand to speak. She stated that she was in a lot of pain and that she felt isolated in her position at the center. Hale stated that she was concerned because the center kept firing

employees but was not filling the vacant positions, which was creating more work for the remaining employees. She stated that anytime she raised issues to the administration, she was told that if she did not like what was happening, she should leave. Hale stated that Orr became very upset with her comments and responded that that particular portion of the retreat was over. During her deposition, Orr stated that she did not recall Becker, Hale, or Embry making any of the foregoing statements at the retreat, nor did she recall hearing the facilitator state any ground rules for the retreat.

{¶ 23} When Becker approached Orr the following day to inquire about Orr's comment at the retreat, Orr told Becker that she did not trust her because Becker had promised once before that she would complete her paperwork for a state audit and had failed to do so. As a result of this prior incident, Becker had received a corrective-action form dated January 3, 2000. The form noted that Becker had been given two prior deadlines in October 1999 and November 1999 to complete her paperwork and that she had failed to do so. Becker had also received comments in a September 1998 performance review and an April 2000 performance review indicating that she needed to increase her proficiency in meeting her paperwork deadlines. Orr had also noted in the April 2000 performance review that Becker was having difficulty with her peers.

{¶ 24} Hale stated that Orr also spoke with her on the day following the retreat. According to Hale, Orr told her the following: "I want you to know that you're very tainted in administration. They do not like you. They do not like your memos, and they don't care about nor do they want to hear about your legal medical issues. You know this agency is dysfunctional, and if you want a raise I can tell you how to get it if you will work with me * * * you've got to play the game * * *."

{¶ 25} Hale told Orr that she would not "play the game." Hale was fired on September 26, 2000, along with Embry and another employee. On or around October 9, 2000, Becker was placed on a five-day suspension. Becker was also given a Last Chance Agreement, which required her to complete her delinquent paperwork within seven days. When Becker refused to sign the agreement, she was terminated on October 20, 2000. Following her termination, Becker wrote a letter to Lohrman asking that she be permitted to file a grievance regarding her termination. Becker stated that other employees at the center were behind in their paperwork as well. Lohrman denied her request.

{¶ 26} In March 2001, Hale and Becker filed a complaint against the VOA alleging that they had been terminated in violation of public policy because they had voiced concerns about the operation of the Pogue Center, which they believed involved violations both of Ohio law and of the VOA's obligations to provide suitable housing and treatment for its residents under various sections of the

Ohio Administrative Code. Hale and Becker also pleaded a claim for promissory estoppel. They alleged that the VOA had terminated their employment in violation of its explicit promise at the retreat that they would not be terminated for voicing concerns about the center. Hale also alleged that she had performed job functions outside of her scheduled work time for which she was not compensated, in violation of the Fair Labor Standards Act and Ohio's Overtime Act.

{¶ 27} In August 2002, the VOA moved for summary judgment on all of Hale's and Becker's claims. The trial court granted the VOA's motion. Hale and Becker now appeal, raising one assignment of error.

{¶ 28} In their sole assignment of error, Hale and Becker contend that the trial court erred in granting summary judgment to the VOA on their claims for wrongful discharge and promissory estoppel,[1] when genuine issues of material fact remained to be decided.

{¶ 29} Summary judgment is properly granted when "(1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."[2] We review a trial court's decision on a motion for summary judgment de novo.[3]

{¶ 30} Hale and Becker first contend the trial court erred in granting the VOA's motion for summary judgment on their claim for wrongful discharge in violation of Ohio public policy.

{¶ 31} Under Ohio law, at-will employees may be discharged by their employer for any reason, or no reason at all, provided that their termination is not contrary to public policy.[4] " 'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations,

---

1. Although Hale also brought an FLSA claim below, she has not challenged the trial court's entry of summary judgment on that claim in this appeal.

2. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 67, 8 O.O.3d 73, 375 N.E.2d 46.

3. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, at ¶ 24.

4. *Greeley v. Miami Valley Maintenance Contractors, Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph two of the syllabus.

and the common law. [Citation omitted]."[5] To succeed on a claim for wrongful discharge in violation of public policy, a plaintiff-employee must establish the following:

{¶ 32} " ' "1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);

{¶ 33} " ' "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);

{¶ 34} " ' "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element);

{¶ 35} " ' "4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis sic.)' "[6]

{¶ 36} The first two elements, the clarity element and the jeopardy element, pose questions of law to be determined by the court, while the third and fourth elements, the causation element and the overriding-business-justification element, pose questions of fact for the trier-of-fact.[7]

{¶ 37} Hale and Becker contend they were terminated because they voiced concerns about the operation of the Pogue Center, which they believed involved violations of both Ohio law and the VOA's obligations to provide suitable housing and treatment for its residents under the following sections of the Ohio Administrative Code: Ohio Adm.Code 5120:1–3–01 through 5120:1–3–17, Ohio Adm.Code 3793:2–1–01 through 3793:2–5–01, and Ohio Adm.Code 4723–10 through 4723–17. Hale and Becker contend that these administrative regulations set forth the public policy of Ohio with respect to how outpatient facilities, halfway houses, and residential facilities providing rehabilitation programs for former inmates of Ohio correctional facilities are expected to manage their programs, including those dealing with drug-related problems, mental illness, and sexual issues. They contend that Ohio has an interest in protecting the safety, health, and welfare of individuals in these programs.

{¶ 38} The VOA contends, on the other hand, that Hale's and Becker's public-policy claims are not based upon the policy set forth in administrative code, but

---

5. *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus.

6. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 69–70, 652 N.E.2d 653, quoting H. Peritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398–399.

7. Id.

upon the public policy set forth in the whistleblower statute, R.C. 4113.52. Consequently, the VOA contends that because Hale and Becker did not comply with the requirements of that statute, they could not maintain a common-law public-policy claim.

{¶ 39} In *Kulch v. Structural Fibers*, the Ohio Supreme Court held that an at-will employee may maintain a common-law public-policy claim regardless of whether the employee has complied with the whistleblower statute, "if he can identify a source of public policy separate from the public policy embodied in R.C. 4113.52." [8]   If, however, the at-will employee's common-law claim embodies only the public policy set forth in R.C. 4113.52, the whistleblower statute, the court held that the employee must strictly comply with the requirements of that statute.[9]   The employee in *Kulch* had been fired for reporting his employer's violation of federal workplace-safety laws to the Occupational Safety and Health Administration.  The court concluded that the employee could maintain a common-law tort action for wrongful discharge solely on the basis of Section 660(c)(1)(a), Title 29, U.S.Code, which prohibits employers from retaliating against employees who file complaints with OSHA.[10]   The court further held that the employee could additionally rely on the public policy set forth in R.C. 4113.52, if he complied with the requirements of that statute.[11]   In *Pytlinski v. Brocar Prods.*, the Ohio Supreme Court stated that "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." [12]

{¶ 40} In this case, Hale and Becker did not plead a whistleblower claim under R.C. 4113.52.  Likewise, they do not contend that they strictly complied with the whistleblower statute.  Rather, they claim that they set forth an independent basis for their public-policy claims.  Because we have not yet addressed the independent-public-policy exception to the whistleblower statute, we look to cases from other appellate districts for guidance.

{¶ 41} Hale and Becker, in arguing that they invoked a public policy separate from the whistleblower statute, rely on two cases: one from the Second Appellate District and one from the Fifth Appellate District.  In *Powers v. Springfield City*

---

**8.**  *Doody v. Centerior Energy Corp.* (2000), 137 Ohio App.3d 673, 679, 739 N.E.2d 851; *Kulch v. Structural Fibers* (1997), 78 Ohio St.3d 134, 162, 677 N.E.2d 308.

**9.**  *Kulch*, supra, paragraph three of the syllabus.

**10.**  Id. at 151–153, 677 N.E.2d 308.

**11.**  Id. at 153–154, 677 N.E.2d 308.

**12.**  (2002), 94 Ohio St.3d 77, 80, 760 N.E.2d 385.

*Schools,*[13] the Second Appellate District held that a school counselor's failure to comply with the requirements of the whistleblower statute did not preclude her from asserting a common-law claim for wrongful discharge based on *Greeley v. Miami Valley Maintenance Contractors, Inc.* The school counselor had alleged that she had not been promoted because she had reported an alleged incident of child abuse by a school principal. The Second Appellate District concluded that the counselor had stated an independent basis for her *Greeley* claim. The court held that R.C. 2151.421(A)(1)(a), which requires a certain class of professionals, when they either know or suspect that a child has suffered or faced the threat of abuse, to immediately report their knowledge or suspicion to a children services agency or a municipal or county peace officer, contains a clear public policy in favor of reporting suspected child abuse. Thus, it was held that the trial court had erred in dismissing the counselor's *Greeley* claim solely on the basis of her failure to comply with the whistleblower statute.

{¶ 42} In *Jamison v. Am. Showa,*[14] an employee claimed that he had been terminated for reporting his company's ongoing pattern of environmental violations to the Environmental Protection Agency. The Fifth Appellate District held that the trial court had erred in granting summary judgment in favor of the employer because the employee had set forth two separate and independent sources of public policy. According to the court, one source of public policy was embodied in the whistleblower statute and a second source was embodied in "environmental laws and EPA regulations." The Fifth Appellate District held that because the general public has a strong interest in being assured that corporations are complying with environmental laws and EPA regulations, and because a company's noncompliance with these laws and regulations can potentially affect the health and safety of an entire community, the trial court had erred in granting summary judgment to the employer.

{¶ 43} The VOA contends, on the other hand, that Hale's and Becker's claims are analogous to the plaintiffs' claims in *Evans v. PHTG, Inc.*[15] The employee in *Evans* had alleged that she had been discharged from her employment because she had reported to her coemployer, that another coemployer, who was not a physician, had violated the law by performing an unlicensed medical procedure on a patient. The employee had brought forth a *Greeley* claim, arguing that Ohio had a broad societal interest in ensuring the public safety by having only duly licensed professionals perform licensed medical procedures.[16] While the Elev-

---

13. (June 26, 1998) 2d Dist. No. 98–CA–10, 1998 WL 336782.

14. (Dec. 16, 1999) 5th Dist. No. 99CAE–03–014, 2000 WL 1404.

15. 11th Dist. No.2001–T–0054, 2002-Ohio-3381, 2002 WL 1401476, at ¶ 4.

16. Id. at ¶ 31.

enth Appellate District agreed with the employee that this was the public policy of Ohio, it nonetheless held that summary judgment was warranted on her common-law claim for wrongful discharge because she had failed to identify a source of public policy other than R.C. 4113.51 to support her claim.[17] The appellate court reasoned that while R.C. 4731.41, the statute upon which she had relied, made it a criminal offense to engage in the unauthorized practice of medicine, the statute did not specifically prohibit an employer from terminating one who had reported the unauthorized practice of medicine to a supervisor.[18] The only statute, the court held, that prohibited an employer from firing an employee who reported to his employer some criminal offense or safety hazard occurring in the workplace was the whistleblower statute.[19]

{¶ 44} After analyzing the Ohio Supreme Court's discussion of public policy independent from the whistleblower statute, as well as the case law from our sister appellate districts, we conclude that Hale and Becker failed to set forth a public policy separate from the whistleblower statute.

{¶ 45} The Ohio Supreme Court has permitted employees to pursue a *Greeley* claim separate from the whistleblower statute when those employees have claimed that they were fired for raising issues relating to workplace safety. Moreover, Ohio appellate courts have permitted public-policy claims independent of the whistleblower statute when there has been an affirmative duty on the employee, separate and apart from the whistleblower statute, to report the violation at hand. For example, in *Powers,* the school counselor had an affirmative duty under the Ohio Revised Code to report child abuse. Likewise, Ohio courts have permitted public-policy claims independent of the whistleblower statute when a statute or administrative regulation specifically prohibits employers from retaliating against employees who file complaints with the appropriate authorities. For example, in *Kulch,* the Ohio Supreme Court held that an employee could maintain a common-law tort action for wrongful discharge solely on the basis of Section 660(c)(1)(a), Title 29, U.S.Code, which prohibits employers from retaliating against employees who file complaints with OSHA. Reading these cases together, we are convinced that the independent source of public policy must parallel the public policy set forth in the whistleblower statute.

{¶ 46} In this case, Hale and Becker maintained that they were terminated for complaining about their co-workers' treatment of the offenders in each of the three programs at the Pogue Center. While we agree that Ohio does have an

17. Id. at ¶¶ 33 and 38.

18. Id. at ¶ 32.

19. Id. at ¶¶ 33 and 41.

interest in the operation of a facility like the Pogue Center, the administrative regulations that Hale and Becker relied upon did not, alone, support their public-policy claim. None of these administrative regulations specifically protect adult offenders from abuse in offender-treatment facilities such as the Pogue Center.[20] Furthermore, none of these regulations affirmatively required Hale and Becker, as employees of the center, to report abuse, nor did they prohibit the VOA from terminating their employment for such reports.[21] Moreover, Hale and Becker did not allege that they were terminated for raising workplace-safety violations.

{¶ 47} The sections of the Ohio Administrative Code that Hale and Becker relied upon as support for their public-policy claim merely provided baseline technical criteria that the VOA had to meet in order to be licensed to operate the Pogue Center. By relying solely on these technical administrative regulations, without relying on the public policy embodied in the whistleblower statute, Hale and Becker could not demonstrate that their termination violated public policy. Furthermore, many of Hale's and Becker's contentions that they were performing more than their fair share of work because the agency was understaffed, that the head of the agency was never present at the center, and that coemployees were disrespectful did not rise to the level of public-policy violations. Many, if not all, of these instances involved typical workplace complaints. Should we permit Hale and Becker to pursue their claims, we would be extending the public-policy exception to the whistleblower statute. We decline to do so. Consequently, we hold that Hale and Becker could not, as a matter of law, establish that their termination violated a clear public policy independent of the whistleblower statute.

{¶ 48} Moreover, we cannot say that public policy would be jeopardized in this instance if Hale and Becker are not able to pursue their *Greeley* claim. Here, Hale and Becker had a remedy in the whistleblower statute that they could have pursued. Consequently, we conclude that Hale and Becker did not, as a matter of law, meet the first two elements of their public-policy claim. We, therefore, do not address their remaining arguments as to causation and overriding business justification. Consequently, we hold that the trial court did not err in granting summary judgment on their public-policy claim.

---

**20.** While Hale and Becker point to Ohio Adm.Code 3793:2–1–05(G)(13)(b)(v), this regulation specifically states that it applies only to those alcohol- and drug-treatment programs that provide treatment for children and adolescents.

**21.** Cf. *Dolan v. St. Mary's Mem. Home,* 153 Ohio App.3d 441, 2003-Ohio-3383, 794 N.E.2d 716 (where this court held that a nursing-home employee who claimed that she had been fired for reporting patient abuse by her supervisor had set forth a clear public policy under the nursing home patients' bill of rights).

{¶ 49} Hale and Becker next contend the trial court erred in granting summary judgment on their promissory-estoppel claim when genuine issues of material fact remained to be decided.

{¶ 50} Promissory estoppel is a separate and independent exception to the employment-at-will doctrine.[22] In order to prevail on a claim of promissory estoppel, Hale and Becker had to show (1) a promise, clear and unambiguous in its terms, (2) their reliance upon the promise, (3) that their reliance was reasonable and foreseeable, and (4) that they were injured by their reliance.[23] The second and third elements are generally questions of fact for a jury to resolve.[24]

{¶ 51} The VOA contends that Hale and Becker did not satisfy the first element of their claim for promissory estoppel because there was no evidence of a clear and unambiguous promise by the VOA. The VOA argues that because the retreat was organized and run by an independent company whose own employee, Harris, had made the comments upon which Hale and Becker had relied, it was entitled to summary judgment. Hale and Becker maintain, however, that because Harris had been retained by the VOA for the retreat, his statements that they could speak their minds without fear of reprisal could be imputed to the VOA.

{¶ 52} "In order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority."[25] "The burden of proving such agency exists rests upon the party asserting the agency."[26]

---

**22.** See, e.g., *Dolan*, supra, note 21.

**23.** *Weiper v. W.A. Hill & Assocs.* (1995), 104 Ohio App.3d 250, 260, 661 N.E.2d 796; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph three of the syllabus.

**24.** *Uebelacker v. Cincom Systems, Inc.* (1988), 48 Ohio App.3d 268, 273, 549 N.E.2d 1210.

**25.** *Master Consol. Corp. v. BancOhio Natl. Bank* (1991), 61 Ohio St.3d 570, 575 N.E.2d 817, syllabus.

**26.** *Irving Leasing Corp. v. M & H Tire Co.* (1984), 16 Ohio App.3d 191, 195, 16 OBR 205, 475 N.E.2d 127.

{¶ 53} While we recognize that the existence of an agency relationship is typically a question of fact,[27] Hale and Becker put forth no evidence to indicate that Harris's statements constituted a clear and ambiguous promise on behalf of the VOA. In her deposition, Hale stated that Harris had told them that "because of their rules (i.e. NCCJ)—group rules, they would hope that would enable everyone to feel trusting and honest." Furthermore, in a letter written by Harris to Hale following her termination from the VOA, Harris stated that at the beginning of the workshop, he followed his standard procedure of both stating and posting a set of ground rules for the participants. Because Hale and Becker failed as a matter of law to establish an essential element of their promissory-estoppel claim, the trial court did not err in granting the VOA's motion for summary judgment on this claim. Consequently, we overrule their sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

WINKLER, J., concurs.

HILDEBRANDT, J., dissents.

HILDEBRANDT, Judge, dissenting.

{¶ 54} Because I believe that summary judgment was improvidently granted on both causes of action asserted by Hale and Becker, I respectfully dissent. First, as to the wrongful-discharge claim, I believe that the majority expresses an unduly restrictive view of what constitutes an independent policy under *Kulch.* To be cognizable in a wrongful-discharge claim under *Kulch,* a policy need only be independent of the protections of the whistleblower statute; there is no requirement that the source of the independent policy itself mandate disclosure of violations by an employee, or that it explicitly prevent the discharge of an employee for such a disclosure.[28] Here, Hale and Becker have identified numerous sources of administrative law mandating the proper care of residents of facilities such as the Pogue Center. Their citation of these sources, combined with evidence that they had been fired because of their efforts to advance the policies embodied in those sources, rendered summary judgment erroneous.

{¶ 55} Similarly, I believe that genuine issues of material fact remain with respect to the promissory-estoppel claim. Although the existence of an agency relationship between VOA and Harris was arguably tenuous, Hale and Becker presented enough evidence to withstand a summary-judgment motion. The VOA

---

27.  *McSweeney v. Jackson* (1996), 117 Ohio App.3d 623, 631, 691 N.E.2d 303.

28.  See *Jamison,* supra note 14.

hired Harris to conduct the retreat, and there was at least a permissible inference that his explicit grant of "immunity" concerning statements made at the retreat was made on behalf of the VOA in an effort to correct the obvious internal friction in the organization. Because I believe that there was sufficient evidence to demonstrate genuine issues of material fact, I respectfully dissent.