[Cite as *McGowan v. Medpace, Inc.*, 2015-Ohio-3743.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MARY MCGOWAN, M.D., | : | APPEAL NOS. C-140634 |
| | | C-140652 |
|     Plaintiff-Appellee/Cross-Appellant, | : | TRIAL NO. A-1108336 |
| | : | *O P I N I O N.* |
|   vs. | : | |
| | : | |
| MEDPACE, INC., | : | |
|     Defendant-Appellant/Cross-Appellee. | : | |
| | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: September 16, 2015

*Freking & Betz, LLC*, *Randolph Freking* and *Brian P. Gillan*, for Plaintiff-Appellee/Cross-Appellant Mary McGowan, M.D.,

*Thompson Hine LLP*, *Deborah S. Brenneman* and *George B. Musekamp*, for Defendant-Appellant/Cross-Appellee Medpace, Inc.,

*The Gittes Law Group*, *Frederick M. Gittes* and *Jeffrey P. Vardaro*, for Amicus Curiae the Ohio Employment Lawyers Association.

Please note: this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1}    Defendant-appellant/cross-appellee Medpace, Inc., and plaintiff-appellee/cross-appellant Mary McGowan, M.D., have appealed from the trial court's order entering final judgment in favor of McGowan on her claim against Medpace for wrongful discharge in violation of public policy.  Because McGowan failed to identify a clear public policy in support of her wrongful-discharge claim, we hold that the trial court erred by failing to grant a directed verdict to Medpace.

### Background and Procedure

{¶2}    Medpace is a research facility that designs and conducts clinical trials to test new pharmaceuticals.  In the spring of 2011, Medpace hired McGowan as an at-will employee to take over duties from one of its retiring physicians, Dr. Evan Stein.  McGowan was hired as the executive director of both Medpace's Clinical Pharmacology Unit ("CPU") and its Metabolic and Atherosclerosis Research Center ("MARC").  The CPU conducted phase one studies to observe participants' first exposure to a drug.  The MARC conducted later-stage studies on various drugs.  The sponsor of each drug study in the MARC selected a principal investigator to run the study.  McGowan was responsible for recruiting new studies to the MARC, and she was additionally appointed by Stein to replace him as the principal investigator on studies that he had previously recruited.  McGowan had additionally agreed to take over control of Stein's private practice, the Cholesterol Treatment Center ("CTC").  The CTC was not affiliated with Medpace and was solely owned by Stein, although it was located on Medpace's premises.  Most participants in the MARC studies were patients at the CTC, and the two entities shared employees.

{¶3} Shortly after taking over the CTC, McGowan observed several practices in the facility that troubled her. Stein had prescribed patients a larger dose of medication than was medically necessary, and had then directed the patients to split the prescribed pills. McGowan felt that this practice of pill splitting constituted insurance fraud and compromised patient safety because the written prescription provided to the pharmacy did not match the instructions in a patient's chart. McGowan was further troubled by Stein's practice of combining into one chart the medical records of CTC patients who were enrolled in a MARC study. In her opinion, personal information necessary to the CTC chart was irrelevant to treatment in the MARC and should not be contained in the MARC files. Last, McGowan was concerned with the MARC's practice of leaving patient charts open on carts outside of treatment rooms. She felt that these two practices were in violation of the Health Insurance Portability and Accountability Act ("HIPAA").

{¶4} McGowan contacted a health-care attorney regarding her concerns about Stein's pill-splitting and prescription-writing practices. After receiving confirmation from this attorney that her concerns were legitimate, McGowan called a staff meeting on July 22, 2011. At this meeting, she instructed the staff that they had to change the way that prescriptions were written and the way that charts were handled. McGowan stated that Stein's prescription-writing practices had been fraudulent. After learning of this meeting and McGowan's accusations, Stein removed McGowan from all activity in both the MARC and CTC via an email sent on July 25, 2011.

{¶5} On July 27, 2011, McGowan met with August Troendle, Medpace's president and CEO, and Tiffany Khodadad, Medpace's executive director of human

3

resources. During this meeting, McGowan raised her concerns about Stein's prescription-writing practices and the HIPAA violations that she felt she had observed. Troendle told McGowan that it was inappropriate for her to have accused Stein of fraud in front of the staff. He stated that her concerns would be investigated, and he encouraged her to investigate them as well. According to Troendle, McGowan was adamant that Stein had committed fraud and that she had the right to air her concerns to whomever she wished. Troendle clarified to McGowan that she was still the executive director of the MARC, but that he could not control whether Stein retained control of the CTC or the studies at MARC that he had previously recruited. Neither McGowan's title nor salary changed after Stein took back control of the CTC and his MARC studies.

{¶6} On July 28, 2011, McGowan sent an email to Khodadad, Troendle, and Kay Nolan, Medpace's general counsel. In the email, McGowan stated that she felt she was being retaliated against for expressing her concerns about improper practices at the CTC. She stated that Troendle had informed her that she would not be restored to director of either the CTC or MARC until she apologized to Stein, and that Troendle had referred to Stein as an "asshole" and an "egomaniac." Troendle responded to this email, denying that he had referred to Stein in such a manner and clarifying that McGowan remained head of the CPU, but that he had no authority to remove Stein as the principal investigator on Steins' MARC studies.

{¶7} Following this meeting and email exchange, McGowan continued her duties as director of the CPU. But she felt that she could be fired from Medpace at any point, and she retained an attorney. On August 17, 2011, McGowan attended a standard Medpace staff meeting. At Troendle's request, she stayed after the meeting

to speak with him. Troendle acknowledged that McGowan had hired an attorney to negotiate her departure from Medpace, but expressed his desire for her to continue her employment. McGowan told Troendle that she was disappointed that he had lied about calling Stein an asshole. Troendle again told McGowan that it had been inappropriate to accuse Stein of fraud in front of the staff. McGowan stated that Troendle could not stop her from speaking the truth and she accused Troendle of trying to intimidate her.

{¶8} After that meeting, Troendle determined that he had to terminate McGowan's employment with Medpace. On August 18, 2011, two representatives from Medpace's department of human resources informed McGowan that she had been fired.

{¶9} On October 19, 2011, McGowan sued Medpace for wrongful discharge in violation of public policy, sex discrimination, intentional infliction of emotional distress, and promissory estoppel. The case proceeded to a jury trial. At the close of McGowan's case, Medpace moved for a directed verdict. As relevant to this appeal, Medpace argued in its motion that McGowan's claim for wrongful discharge in violation of public policy failed as a matter of law, because she had failed to establish the first two elements of that claim. The trial court denied Medpace's request, both when initially made and when it was renewed at the close of all evidence. The jury found in favor of Medpace on McGowan's claims for sex discrimination, intentional infliction of emotional distress, and promissory estoppel. But it found in favor of McGowan on her claim for wrongful discharge in violation of public policy. It awarded her $300,000 in compensatory damages, $500,000 in punitive damages, and attorney fees.

{¶10}  After the trial court entered final judgment on that claim in favor of McGowan, Medpace filed a motion for judgment notwithstanding the verdict, and alternatively for a new trial.  McGowan also filed a similarly titled motion, arguing that the jury had erred in its calculation of damages.  The trial court denied both motions.

{¶11}  Medpace has appealed the trial court's judgment.  In three assignments of error, Medpace argues that the trial court erred in failing to dismiss McGowan's claim for wrongful discharge in violation of public policy, by providing the jury with improper and incomplete jury instructions, and by awarding McGowan all requested attorney fees.  McGowan has also appealed the trial court's judgment. In one assignment of error, she challenges the jury's calculation of her damages.

### Wrongful Discharge in Violation of Public Policy

{¶12}  Medpace argues in its first assignment of error that the trial court's failure to dismiss McGowan's claim for wrongful discharge in violation of public policy was in error.  Medpace contends that the trial court should have granted either its motion for a directed verdict or motion for judgment notwithstanding the verdict with respect to this claim.

{¶13}  We review a trial court's ruling on a motion for a directed verdict de novo.  *See Bennett v. Admr., Ohio Bur. of Workers' Comp.*, 134 Ohio St.3d 329, 2012-Ohio-5639, 982 N.E.2d 666, ¶ 14.  A directed verdict should be granted when the trial court "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion * * * and that conclusion is adverse to such party."  Civ.R. 50(A)(4).

6

{¶14} Medpace had employed McGowan as an at-will employee. Under the common law employment-at-will doctrine, the employment relationship between an employer and an at-will employee may be terminated by either party for any reason, and the termination of such an employee generally does not give rise to an action for damages. *See Collins v. Rizanka,* 73 Ohio St.3d 65, 67, 652 N.E.2d 653 (1995); *see also Dohme v. Eurand America, Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 11.

{¶15} But in *Greeley v. Miami Valley Maintenance Contrs., Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), the Ohio Supreme Court recognized an exception to this employment-at-will doctrine. The *Greeley* court held that an at-will employee may maintain a cause of action for wrongful discharge when the employee is terminated in violation of a clearly expressed public policy. *Greeley* at 234. To establish a claim for wrongful discharge in violation of public policy, an employee must demonstrate that a clear public policy existed (the clarity element); that the employee's dismissal jeopardized the public policy (the jeopardy element); that the employee's dismissal was motivated by conduct related to the public policy (the causation element); and that the employer did not have an overriding business justification to support dismissal of the employee (the overriding justification element). *See Collins,* at 69-70. The clarity and jeopardy elements present questions of law, while the causation and overriding-justification elements present questions of fact. *Id.*

{¶16} McGowan contended that she had been wrongfully discharged for reporting her concerns about Stein's prescription-writing practices, which she alleged constituted insurance fraud and compromised patient safety. She argued

that her firing on these grounds violated the public policy established in R.C. 2913.47, which prohibits insurance fraud. She further contended that she had been wrongfully discharged in violation of the public policy established in HIPAA for reporting her complaints about Stein's practices of combining the charts of patients in the MARC and CTC and of leaving patient charts open on carts.

{¶17} Medpace argues that the trial court should have dismissed McGowan's wrongful-discharge claim because she had failed to establish the clarity element with respect to both of her public policy arguments. Medpace specifically contends that neither R.C. 2913.47 nor HIPAA complied with the precedent established by this court in *Hale v. Volunteers of Am.*, 158 Ohio App.3d 415, 2004-Ohio-4508, 816 N.E.2d 259 (1st Dist.), and *Dean v. Consol. Equities Realty #3, LLC*, 182 Ohio App.3d 725, 2009-Ohio-2480, 914 N.E.2d 1109 (1st Dist.).

{¶18} In *Hale*, we considered whether two former employees of a residential treatment center for convicted felons could maintain an action against their former employer for wrongful discharge in violation of public policy based on a public policy that was independent of Ohio's whistleblower statute. *Hale* at ¶ 40. The employees had contended that they were wrongfully discharged for reporting their concerns about the operation of the rehabilitation center in violation of the public policy established by various regulations in the Ohio Administrative Code. *Id.* at ¶ 37. We determined that in the context of that claim, an "independent source of public policy must parallel the public policy set forth in the whistleblower statute." *Id.* at ¶ 45. Because the administrative code provisions relied on by the employees did not affirmatively require them to report their concerns, and did not prohibit the rehabilitation center from terminating employees for reporting their concerns, and

8

because the employees had not alleged that they were terminated for reporting workplace-safety violations, we held that they had failed to establish that their employment was terminated in violation of a clear public policy independent of the whistleblower statute. *Id.* at 46-47.

{¶19} In *Dean*, a former employee of Colerain Ford had alleged that he had been wrongfully terminated in violation of public policy for reporting his concerns that the dealership's business practices constituted fraud. He argued that Ohio had a clear public policy against fraud, evidenced in R.C. 2921.13. *Dean* at ¶ 10. In rejecting Dean's argument, we emphasized that the public-policy exception to the at-will employment doctrine should be narrowly applied. *Id.* at ¶ 12. We held that Dean had failed to establish an independent source of public policy to support the clarity element of his claim, because the statute that he had relied upon failed to impose an affirmative duty on an employee to report a violation, failed to prohibit an employer from retaliating against an employee who had filed complaints, and did not protect the public's health or safety. *Id.* at ¶ 11-12.

{¶20} McGowan argues that the Ohio Supreme Court has never similarly limited the type of public policy applicable to a wrongful-discharge-in-violation-of-public-policy claim and has never held that such a claim must be based on a public policy that either addresses the conduct of the employee or regulates the conduct of the employer. She contends that a public policy is sufficient to satisfy the clarity element when it is applicable to the employer and implicated in the employee's termination.

{¶21} Other appellate districts have adopted McGowan's position. *See Alexander v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 95727, 2012-Ohio-

1737, ¶ 36 ("We find, however, no requirement that a supporting statute be employment-related or otherwise set forth an employer's responsibilities and/or an employee's rights."). But several federal courts have reached the same conclusion as this district and have cited *Hale* and *Dean* with approval. In *Crowley v. St. Rita's Med. Ctr.*, 931 F.Supp.2d 824 (N.D.Ohio 2013), the United States District Court for the Northern District of Ohio held that

> This Court finds more persuasive the reasoning of the Ohio courts that require the public policy invoked in a *Greeley* claim to parallel the policies underlying the whistleblower statute or protect employee or public safety. The courts of Ohio generally have found that *Greeley* claims cannot lie with every public policy, even 'good' ones, and appropriately so. Without these limitations, *Greeley* claims could evolve from exceptions to the employment at-will doctrine to the rule itself.

*Crowley* at 831. *See Gates v. Beau Townsend Ford, Inc.*, S.D.Ohio No. 3:08-cv-054, 2009 U.S. Dist. LEXIS 110005, * 27 (Nov. 24, 2009) ("[T]he clear public policy, if separate from the whistleblower statute, must parallel the whistleblower statute or be criminal in nature.").

{¶22} A claim for wrongful discharge in violation of public policy was created *as an exception* to the employment-at-will doctrine. As recognized by the *Crowley* court, absent a narrow interpretation of the types of public policy applicable to these claims, the exception becomes the rule. With the continued and ongoing explosion in statutes, governmental regulations, and policies found under the Ohio Revised Code and the Ohio Administrative Code, as well as federal laws and regulations, if

exceptions to the at-will-employment doctrine are not narrowly construed, the so-called "exceptions" will speedily and overwhelmingly undermine and eliminate the concept of at-will employment in this state. The employment-at-will doctrine is, as conceded by all parties herein, the starting point for an employment-law analysis for this type of claim. This doctrine has remained untouched by the legislature since its inception, and is effectively one of Ohio's most basic "public policies" on employment issues. If this court were to disregard now longstanding case law like *Hale* and *Dean*, this most important public policy would be destroyed. Such a change in basic Ohio public policy should be left to the legislature, not this court.

{¶23} *Hale* and *Dean* are the law of this district and we continue to adhere to them. In a claim for wrongful discharge in violation of public policy, an employee satisfies the clarity element by establishing that a clear public policy existed, and that the public policy was one that imposed an affirmative duty on an employee to report a violation, that prohibited an employer from retaliating against an employee who had reported a violation, or that protected the public's health and safety.

{¶24} We now consider whether the public policies relied on by McGowan meet these criteria. McGowan argued that she had been terminated for reporting her concerns about Stein's prescription-writing practices, namely pill splitting, in violation of the public policy established in R.C. 2913.47. This insurance-fraud statute provides in relevant part that

> No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following:
>
> (1) Present to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of, an application for

insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive;

(2) Assist, aid, abet, solicit, procure, or conspire with another to prepare or make any written or oral statement that is intended to be presented to an insurer as part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive.

R.C. 2913.47(B).

{¶25} While this statute arguably establishes a valid public policy against insurance fraud, it cannot serve as the basis for an exception to the employment-at-will doctrine. *See Dean*, 182 Ohio App.3d 725, 2009-Ohio-2480, 914 N.E.2d 1109, at ¶ 12. This statute does not place an affirmative duty on an employee to report a violation, prohibit an employer from retaliating against an employee who has reported a violation, or protect the public's health and safety. Consequently, it will not support McGowan's wrongful-discharge claim.

{¶26} We reach the same conclusion with respect to McGowan's argument that her termination was in violation of the public policy established in HIPAA. In *Wallace v. Mantych Metal-Working*, 189 Ohio App.3d 25, 2010-Ohio-3765, 937 N.E.2d 177 (2d Dist.), the Second Appellate District recognized HIPAA as a valid source of public policy in a wrongful-discharge case. It held that HIPAA manifested a public policy favoring the confidentiality and privacy of medical records. *Wallace* at ¶ 41. As recognized by the Second District and explained by McGowan in both her

appellate brief and at oral argument, HIPAA was enacted to help protect patient-privacy rights. HIPAA manifests an important and useful public policy, but the protection of patient privacy is not the type of public policy contemplated by *Hale* and *Dean*.

{¶27} Because McGowan failed to establish that she was discharged in violation of a clear public policy that imposed an affirmative duty on an employee to report a violation, that prohibited an employer from retaliating against an employee who had reported a violation, or that protected the public's health and safety, she has failed to satisfy the clarity element of her wrongful-discharge claim. Consequently, reasonable minds could only reach one conclusion on the evidence submitted—that McGowan could not succeed on her claim for wrongful discharge in violation of public policy. We hold that the trial court erred by failing to grant Medpace a directed verdict on this claim.

{¶28} Medpace's first assignment of error is sustained. Our resolution of this assignment of error renders Medpace's remaining assignments of error and the assignment of error raised in McGowan's cross-appeal moot.

### Conclusion

{¶29} The trial court erred by failing to grant a directed verdict to Medpace on McGowan's claim for wrongful discharge in violation of public policy. We reverse the trial court's judgment in favor of McGowan, and remand this cause with instructions for the trial court to enter judgment in favor of Medpace on this claim.

Judgment reversed and cause remanded.

DEWINE, J., concurs.
HENDON, P.J., dissents.

13

**HENDON, P.J**., dissenting.

{¶30} I agree with the majority's determination that *Hale* and *Dean* are the law of this court, and that a public policy will not satisfy the clarity element of a claim for wrongful discharge in violation of public policy unless it comports with one of the requirements outlined in these cases. But I believe that McGowan has sufficiently established that she was discharged in violation of a public policy that met one of these requirements: HIPAA.

{¶31} The majority recognizes that HIPAA manifests a public policy in favor of protecting patient-privacy rights. The disclosure of a patient's confidential medical information can have a far-reaching effect, and, and in my opinion, patient-privacy rights directly implicate the public's health and safety. For this reason, I would conclude that McGowan satisfied the clarity element of her claim for wrongful discharge in violation of public policy and that the trial court did not err in failing to grant a directed verdict in favor of Medpace on her claim.

Please note:

The court has recorded its own entry on the date of the release of this opinion.