**WALLACE, Appellant,**

**v.**

**MANTYCH METALWORKING, Appellee.**

[Cite as *Wallace v. Mantych Metalworking*, 189 Ohio App.3d 25, 2010-Ohio-3765.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23704.

Decided Aug. 13, 2010.

26

Brezine Law Offices and Don Brezine, for appellant.

Dinsmore & Shohl, L.L.P., Susan D. Solle, and Thomas P. Whelley II, for appellee.

---

BROGAN, Judge.

{¶ 1} Dan Wallace has appealed the trial court's entry of summary judgment in favor of Mantych Metalworking on his claims of disability discrimination, disability harassment, retaliation, and wrongful discharge in violation of public policy. We conclude that based on the evidence presented, no fair-minded jury could return a verdict for Wallace on any of these claims, so summary judgment in favor of Mantych is proper. We therefore affirm the trial court's judgment.

I

{¶ 2} In May 1998, Mantych Metalworking hired Dan Wallace, then 48 years old, to work as a model maker in its Kettering facility. (Mantych also has a facility in Xenia.) When Wallace was hired, Michael Mantych was president of the company. Michael died in December of the following year, 1999, and Colleen Mantych, his daughter, succeeded him. For full-time employees, Mantych has a standard 48-hour workweek. At the time of his hire, Wallace was undergoing rehabilitation from recent back surgery, so he could not work Mantych's standard workweek of 48 hours. Indeed, a few months after he was hired, in August, Mantych received from one of Wallace's doctors a note saying that Wallace "should continue to be limited [to] 45 hours per week for health reasons." Two years after he was hired, in April 2000, Wallace had a heart attack and consequently underwent bypass surgery.

{¶ 3} April is bonus month for Mantych employees, but in April 2000 Mantych could not afford to give bonuses or raises to anyone. According to a statement of earnings, which Colleen posted for all to see, medical-insurance costs, heightened by Wallace's and other workers' health problems, were a key reason that money was tight. In August 2000, Colleen called Wallace a "retarded idiot" when she learned that, despite having had a heart attack and surgery a few months ago, Wallace was still smoking. The following March, Mantych received from one of Wallace's doctors another note. This one limited Wallace to working only 30 to 35 hours each week.

{¶ 4} Sometime in 2001, Mantych discharged 60-year-old Dale Frederick because he was unable to work every day, owing to his physical limitations. Wallace heard that Frederick was fired because he was old. In 2002, Wallace learned that Colleen was not meeting with older workers, Wallace included, about raises because she believed that the company's future was not with them. Wallace also heard Colleen say that old employees were costing Mantych too much money and were not worth the investment because they cannot keep up, get sick, are slower, and cannot work all the hours. Wallace believed that Colleen treated him and older workers unfairly by refusing to evaluate them and by refusing to give them bonuses or raises. In December 2002, Mantych received from one of Wallace's doctors another note. This one limited Wallace, because of his medical condition, to a 40–hour workweek until further notice.

{¶ 5} From 2003 until late 2004, Mantych sent Wallace to work at its Xenia facility, troubleshooting production problems. There, Wallace came up with a work schedule that allowed him to do his weekly work in 36 hours. But his supervisor objected to the schedule, indicating that Colleen was not favorably disposed to schedule changes.

{¶ 6} The final year of Wallace's employment was 2005. During that year, Mantych received several more notes from Wallace's doctors. In April, a doctor restricted Wallace to 15 to 30 hours per week because, the note said, multiple medical conditions were made worse by long, strenuous hours. The next month a doctor signed a "return to work" note saying that Wallace was able to return to work on May 18, after being off on May 16 and 17. The next month, a doctor signed another return-to-work note. This one said that Wallace was able to return to work on June 15, after being off on June 10, 13, and 14. And in July, a doctor continued Wallace's 15-to-30-hour workweek limitation.

{¶ 7} During his final year with Mantych, Wallace worked on average only 25.85 hours each week. While a sizeable majority of full-time employees did not work the standard 48–hour week, Wallace had one of the lowest averages. Throughout the year, because of his medical conditions, Mantych did not know if Wallace would be able to work the next day. (Wallace called Mantych on the mornings he did not feel up to it.) To keep production rolling, Mantych needed someone it could count on each day to work the hours that Wallace's medical condition no longer allowed him to work. So, on January 6, 2006, Colleen called Wallace into her office and, expressing her concern about slow production, let him go.

{¶ 8} Following his discharge, Wallace filed several claims. He first filed a claim with the Equal Employment Opportunity Commission ("EEOC") for age discrimination. In February 2006, the EEOC dismissed the claim. Then, in June 2006, Wallace filed a complaint in the Montgomery County Court of Common Pleas, claiming age discrimination and age harassment. The trial court dismissed the complaint for lack of subject-matter jurisdiction. Two years later, in May 2008, Wallace filed a second complaint, the genesis of this case, that contained claims for retaliation, disability discrimination, disability harassment, and wrongful discharge in violation of public policy. In July 2009, Mantych moved for summary judgment on all claims, and, on October 7, 2009, the trial court sustained the motion. Wallace timely appealed.

II

{¶ 9} According to the standard, summary judgment should be rendered if the evidence and stipulations "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). But summary judgment should not be rendered "unless it appears from the evidence or stipulation * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C). A court

must in essence determine whether based on the evidence presented, so construed, a fair-minded jury could return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202. Whether summary judgment should be entered is a question of law, which is reviewed de novo. Here, we must determine whether based on the evidence presented, construed most strongly in favor of Wallace, a jury could return a verdict for Wallace on any of his claims against Mantych. Before doing so, however, we must address two preliminary issues concerning the evidence.

{¶ 10} The first issue concerns the evidence we will consider. We have said that "[i]n an appeal on questions of law the reviewing court may consider only that which was considered by the trial court and nothing more." *State v. Smith* (June 18, 1999), Montgomery App. No. 17350, 1999 WL 961235; see also *State v. Peagler* (1996), 76 Ohio St.3d 496, 668 N.E.2d 489, paragraph one of the syllabus ("While an appellate court may decide an issue on grounds different from those determined by the trial court, the evidentiary basis upon which the court of appeals decides a legal issue must have been adduced before the trial court and have been made a part of the record thereof"). We have said further that "[w]hen an appellate court reviews the record it is confined to those matters which were part of the proceedings before the trial court." *Smith,* citing *State v. Ishmail* (1978), 54 Ohio St.2d 402, 405–406, 8 O.O.3d 405, 377 N.E.2d 500 ("Since a reviewing court can only reverse the judgment of a trial court if it finds error in the proceedings of such court, it follows that a reviewing court should be limited to what transpired in the trial court as reflected by the record made of the proceedings").

{¶ 11} Also, Civ.R. 56(C) allows a court to consider only "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, *timely filed* in the action." (Emphasis added.) Some evidentiary material before us was not considered by the trial court, likely because it was not timely filed or not filed at all. Wallace's responses to Mantych's first set of requests for admission, first set of interrogatories, and first set of document requests, all of which are attached to his merit brief, were not filed with the trial court or attached to his opposition brief. Also, Wallace's deposition, though filed, was not filed until more than two weeks after he filed the notice of appeal. We see nothing in the record that indicates that the trial court considered any of this evidence. We therefore will not consider any of this evidence, which anyway is not heavily relied on by the parties.

{¶ 12} The second issue concerns the evidence we will credit. Wallace contends that courts may not credit evidence favoring a moving party that the jury is not required to believe, which is what the United States Supreme Court seems to say in *Reeves v. Sanderson Plumbing Prods., Inc.* (2000), 530 U.S. 133, 120 S.Ct.

2097, 147 L.Ed.2d 105. The Supreme Court said that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151, citing 9A C. Wright & A. Miller, Federal Practice and Procedure (1995) 299, Section 2529. "That is," the court continued, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Id. at 151, quoting Wright & Miller at 300. Mantych attached to its summary-judgment motion an affidavit by Colleen Mantych. Colleen is an "interested" witness, Wallace says, so we may not credit most of the affidavit's statements. Mantych disputes this rule, dismissing it out of hand as "illogical" since a jury need not believe any evidence put before it. Although Wallace made this contention to the trial court, the court did not refer to the issue or cite *Reeves*.

{¶ 13} This issue is not always material in the summary-judgment context because the movant is not required to support its motion with its own evidence. Wallace seems to misunderstand this point. He says that a moving party does not meet its summary-judgment burden unless it presents evidence that demonstrates the nonmoving party has no evidence to support that party's claims. Mantych, argues Wallace, has not put on the record evidence to support its motion for summary judgment. But the Ohio Supreme Court said in *Dresher v. Burt* that "there is no requirement in Civ.R. 56 that the moving party support its motion for summary judgment with any *affirmative evidence, i.e.,* affidavits or similar materials *produced by the movant.*" (Emphasis sic.) (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Rather, the court said, "the moving party bears the initial burden of *demonstrating* that there are no genuine issues of material fact." (Emphasis sic.) Id. The movant satisfies this burden by pointing to evidentiary material of the type listed in Civ.R. 56(C)—already in the record—that shows that the nonmoving party has no evidence to support that party's claims. Id. at 292–293. So Mantych is entitled to summary judgment if the evidence presented by Wallace is insufficient to establish his claims. Because we find that the evidence presented is insufficient, we need not rely on Colleen's affidavit, rendering the issue immaterial in this case.

{¶ 14} We turn now to the assignments of error.

### III

{¶ 15} Wallace assigns four errors to the trial court, one for each claim on which the court entered summary judgment—disability discrimination, disability harassment, retaliation, and wrongful discharge.

First Assignment of Error

{¶ 16} "The trial court erred in granting summary judgment to the defendant based upon its conclusion that plaintiff was not disabled despite plaintiff having placed on the record Rule 56 evidence sufficient to create factual issues regarding each element of plaintiff's charge of disability discrimination against the defendant."

{¶ 17} Wallace's claim for disability discrimination (disparate treatment) alleges that Mantych violated R.C. 4112.02(A). Division (A) makes it unlawful for an employer, "because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To prove that an employer violated division (A), the plaintiff has the initial burden to establish a prima-facie case. A prima-facie case of disparate-treatment discrimination consists of three essential elements: (1) the claimant had a disability, (2) the defendant took an adverse employment action, at least in part, because the plaintiff had the disability, and (3) the claimant, while having a disability, could safely and substantially perform the essential functions of the job in question. *Tibbs v. Ernst Ents., Inc.*, Montgomery App. No. 22850, 2009-Ohio-3042, 2009 WL 1813776, at ¶ 22, citing *Sheridan v. Jackson Twp. Div. Fire*, Franklin App. No. 08AP–771, 2009-Ohio-1267, 2009 WL 714081, at ¶ 5. Here, the issue is whether, based on the evidence presented, a reasonable jury could find that Wallace had a "disability."

{¶ 18} "Disability," as used in division (A), is a term of art. The term is defined by statute to mean "a physical or mental impairment that substantially limits one or more major life activities * * *; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13). This definition contains three more terms of art—the first two are defined by statute. "Physical or mental impairment" means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the body's major systems, including the musculoskelatal system, R.C. 4112.01(A)(16)(a)(i); any mental or psychological disorder, R.C. 4112.01(A)(16)(a)(ii); or a disease or condition, including heart disease, R.C. 4112.01(A)(16)(a)(iii). "Major life activities" include "the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." R.C. 4112.01(A)(13).

{¶ 19} For the meaning of "substantially limits," we look to the federal regulations that interpret the Americans with Disabilities Act ("ADA"). See *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (looking to federal regulations and cases interpreting the ADA for

help interpreting Ohio disability law). The relevant federal regulation defines "substantially limits" generally to mean, as one Ohio court has summarized, the "inability to perform or a severe restriction on the ability to perform, as compared to the average person in the general population." *Slane v. MetaMateria Partners, L.L.C.,* 176 Ohio App.3d 459, 2008-Ohio-2426, 892 N.E.2d 498, at ¶ 16, citing former Section 1630.2(I), Title 29, C.F.R. (now Section 1630.2(j)(1) of Title 29). "Substantially limited" in the ability to work is given a specific meaning: "The term substantially limited means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Section 1630.2(j)(3), Title 29, C.F.R. Notably, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.[1] In other words, the impairment must limit an individual, "not in a trivial or even moderate manner, but in a major way." *Gonzales v. Natl. Bd. of Med. Examiners* (C.A.6, 2000), 225 F.3d 620, 627, fn. 12.

{¶ 20} Having reviewed the relevant law, we turn now to the evidence.

■ {¶ 21} First, we have little difficulty finding that the evidence establishes a qualifying physical impairment. Wallace presented sufficient evidence of back trouble—surgery and rehabilitation—to establish that he had a physiological condition affecting his musculoskelatal system. Also, the evidence shows that Wallace had a heart attack and heart-bypass surgery, evidence that is adequate to establish that he had heart disease. But whether these physical impairments substantially limited one of his major life activities is less clear.

{¶ 22} The evidence of the major life activities that Wallace's impairments affected is composed only of conclusory statements. Wallace's affidavit states that "[a]s a result of my heart attack * * * I suffered from shortness of breath," and that he had an "impaired ability to work long hours because of shortness of breath, dizziness (standing), [and] muscle cramps (walking)." While these are major life activities, the evidence does not establish that Wallace was unable to or significantly restricted in his ability to perform these activities. With respect to breathing, standing, and walking, the statements quoted above are the extent of the limitation evidence. With respect to working, the evidence undoubtedly shows that Wallace is limited in the number of hours he can work. But the evidence does not show that this inability disqualified him from an entire class of jobs or a wide range of jobs; it shows only that the inability disqualified him from

---

1. Wallace rejects the idea that to be substantially limited in the activity of working, an individual's impairment must disqualify him from a wide range of jobs, but this meaning has been adopted by the Ohio Supreme Court. See *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (quoting the federal regulations in this matter).

his job at Mantych. The evidence, therefore, while establishing that Wallace had physical impairments, does not establish that the physical impairments substantially limited one of Wallace's major life activities.

{¶ 23} Wallace also contends that Mantych, in the person of its president, Colleen Mantych, regarded him as having a physical impairment. For Wallace successfully to prove that Colleen regarded him as having a disability, she must have believed that his impairments prevented him from holding a class of jobs or a wide range of jobs. See *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 574, 697 N.E.2d 204. There is no evidence that Colleen believed either. At best, the evidence shows that she considered Wallace to have medical conditions–not disabilities–that disqualified him from his particular job at Mantych.

{¶ 24} Based on the evidence presented, no reasonable juror could find that Wallace had a "disability." Therefore, such a jury could not return a verdict in favor of Wallace on his claim for disability discrimination. Summary judgment on this claim in favor of Mantych is proper.

{¶ 25} The first assignment of error is overruled.

Second Assignment of Error

{¶ 26} "The trial court erred in granting summary judgment to the defendant based upon its conclusion that plaintiff was not disabled despite plaintiff having placed on the record rule 56 evidence sufficient to create factual issues regarding each element of plaintiff's charge of disability harassment against the defendant."

{¶ 27} Wallace's claim for disability harassment also alleges that Mantych violated R.C. 4112.02(A). Of course, as we saw above, to prove a violation of division (A), a plaintiff must prove that he had a "disability." See R.C. 4112.02(A); see also *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 729 N.E.2d 726, at paragraph two of the syllabus. But, as we determined above, no reasonable juror could find that Wallace had a "disability." Therefore his claim for disability harassment must fail, making summary judgment on this claim in favor of Mantych proper.

{¶ 28} The second assignment of error is overruled.

Third Assignment of Error

{¶ 29} "The trial court erred in granting summary judgment to the defendant based upon its conclusion that plaintiff was not disabled despite plaintiff having placed on the record Rule 56 evidence sufficient to create factual issues regarding each element of plaintiff's charge of retaliation against the defendant."

{¶ 30} Wallace's claim for retaliation alleges that Mantych violated R.C. 4112.02(A). Division (I) makes it unlawful for an employer "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." As when proving a violation of division (A), to prove that an employer violated division (I), a plaintiff has the initial burden to establish a prima-facie case. A prima-facie case of retaliation consists of four essential elements: "(1) [the claimant] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer–Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, at ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.* (C.A.6, 1990), 903 F.2d 1064, 1066.

{¶ 31} Wallace says that the protected activity in which he engaged was opposing what he saw as Mantych's unfair treatment of its older workers. He says that he was an "outspoken champion[ ] of the rights of older workers." Specifically, Wallace asserts, "I openly opposed Defendant's unfair treatment of its older workers based on age discrimination, including but not limited to:

{¶ 32} "a. Defendant's refusal to evaluate older workers.

{¶ 33} "b. Defendant's refusal of bonuses to older worker(s).

{¶ 34} "c. Defendant's firing of Dale Frederick because of his age.

{¶ 35} "d. Defendant's refusal of raises to older workers."

{¶ 36} But no evidence supports these conclusory assertions. Nor is there any evidence that Mantych was aware that Wallace engaged in any of these activities. Indeed, because no evidence describes what Wallace did to oppose Mantych's actions or champion older-workers' rights, no inference can even be made that Mantych must have been aware. Regarding adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." ' " *Burlington N. & Santa Fe Ry. Co. v. White* (2006), 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345, quoting *Rochon v. Gonzales*, 370 U.S.App.D.C. 74, 438 F.3d 1211, 1219, quoting *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662. Wallace says that Mantych retaliated against him by refusing to give him a raise and, finally, by firing him. Such action, if true, probably would so dissuade a reasonable worker, making it materially adverse. But, assuming for the moment that the evidence shows that Wallace did oppose Mantych's

conduct and Mantych knew of his opposition, the evidence does not show a causal connection between the protected activity and the adverse action.

{¶ 37} Based on the evidence presented, no fair-minded jury could return a verdict for Wallace on the retaliation claim. Therefore, summary judgment on this claim in favor of Mantych is proper.

{¶ 38} The third assignment of error is overruled.

Fourth Assignment of Error

{¶ 39} "The trial court erred in granting summary judgment to the defendant based upon its conclusion that defendant is not a covered entity under HIPAA law despite plaintiff having placed on the record evidence sufficient to create factual issues regarding plaintiff's charge that defendant fired him because he unearthed the fact that defendant had snooped in plaintiff's medical record."

{¶ 40} Wallace claims that his discharge violated clear Ohio public policy. Such a claim represents an exception to Ohio's common-law doctrine of employment at will. See *Painter v. Graley* (1994), 70 Ohio St.3d 377, 382, 639 N.E.2d 51. The claim gives "a discharged employee * * * a private cause of action sounding in tort for wrongful discharge where his or her discharge is in contravention of a 'sufficiently clear public policy.'" Id., quoting *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 233, 551 N.E.2d 981. To succeed on such a claim, a plaintiff must prove that (1) a "'clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element),'" (2) "'dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element),'" (3) "[t]he plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element),'" (4) "[t]he employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).'" (Emphasis sic.) Id. at 384, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie (1989), 58 U.Cin.L.Rev. 397, 398–399. The clarity and jeopardy elements each present a question of law that courts must answer, and the causation and overriding justification elements each present a question of fact for a fact finder. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 70, 652 N.E.2d 653.

{¶ 41} Wallace alleges that Colleen, by impersonating him, surreptitiously obtained from his insurance company his private medical information. He alleges that when he found out about this and then raised questions about her actions, Colleen fired him. Wallace contends that a dismissal in such circumstances violates clear public policy favoring the confidentiality and privacy of medical records manifest in the federal Health Insurance Portability and Accountability

Act of 1996 ("HIPAA"). We agree that such a public policy clearly exists and is manifest in HIPAA, among other places.

{¶ 42} The Ohio Supreme Court has expressly recognized this public policy. "In general," the court has said, "a person's medical records are confidential. Numerous state and federal laws recognize and protect an individual's interest in ensuring that his or her medical information remains so." *Hageman v. Southwest Gen. Health Ctr.*, 119 Ohio St.3d 185, 2008-Ohio-3343, 893 N.E.2d 153, at ¶ 9. "For example," continued the court, "the Ohio Public Records Act prohibits medical records maintained by public institutions from being released pursuant to a public-records request * * *. Likewise, the federal Health Insurance Portability and Accountability Act of 1996 ('HIPAA') prevents health-care providers from disclosing health information except in certain specific circumstances." Id. "[T]he breach of patient confidentiality is a palpable wrong," the court has said. Id. at ¶ 10. So the court created a remedy for this wrong when it "explicitly recognized and applied this basic policy of confidentiality," in *Biddle v. Warren Gen. Hosp.* (1999), 86 Ohio St.3d 395, 715 N.E.2d 518, by recognizing a separate tort for breach of confidentiality related to medical information. *Hageman* at ¶ 10.

{¶ 43} We discern, therefore, a clear public policy favoring the confidentiality of medical information.

 {¶ 44} The next question is whether a dismissal motivated by an employee's discovery of an employer's violation of this clear public policy, the circumstances under which Wallace alleges he was dismissed, jeopardizes the policy. We think that such a dismissal would jeopardize it. Discussing an individual's right to medical confidentiality, the Ohio Supreme Court said that "such a right 'is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask.'" *Hageman* at ¶ 13, quoting *Hill v. Natl. Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 25, 26 Cal.Rptr.2d 834, 865 P.2d 633. "If the right to confidentiality is to mean anything," said the court, "an individual must be able to direct the disclosure of his or her own private information." Id. An employer that violates an employee's right to keep his medical information confidential and fires the employee when he discovers the violation jeopardizes the public policy favoring confidentiality.[2]

---

2. That Wallace might be able to obtain relief with a claim for breach of confidentiality related to medical records does not per se preclude his ability to obtain relief here with a wrongful-discharge claim. Speaking of statutory claims, the Ohio Supreme Court said in *Kulch v. Structural Fibers, Inc.*, "[t]he *Greeley* public-policy exception to the doctrine of employment at will was not intended to apply only where a statute provides no civil remedies. Rather, *Greeley* and its progeny are intended to bolster the public policy of this state and to advance

{¶ 45} But there is no evidence in this case that these are in fact the circumstances. There is no evidence that Mantych violated this public policy; Wallace conceded this point during his oral argument. Indeed, even from the conclusory assertions in Wallace's affidavit and his description during oral arguments, we are still unable to figure out what precisely it is that Wallace alleges Mantych did to violate his right to medical-information confidentiality. Indeed, it seems plausible to us that the entire episode may have been simply a big misunderstanding.

{¶ 46} Whatever actually happened, based on the (lack of) evidence presented, we must conclude that no fair-minded jury could return a verdict for Wallace on his wrongful-discharge claim. Therefore summary judgment on this claim in favor of Mantych is also proper.

{¶ 47} The fourth assignment of error is overruled.

{¶ 48} We have overruled all the assignments of error presented in this case. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

FROELICH, J., concurs.

GRADY, J., concurs separately.

GRADY, Judge, concurring separately:

{¶ 49} Even if Wallace's adverse health conditions were to constitute a disability, Wallace would also have to prove that he could safely and substantially perform the essential functions of the job in question in order to prove his disability claim against Mantych. *Tibbs v. Ernst Ents., Inc.*, Montgomery App. No. 22850, 2009-Ohio-3042, 2009 WL 1813776.

{¶ 50} The hours of work an employer requires of an employee, unless otherwise limited by law or by contract, are functions of the job that are as essential to its performance as is the employee's ability to perform the particular tasks the job involves. It is undisputed that Wallace is unable, due to his adverse health conditions, to work the number of hours per week that Mantych requires.

---

the rights of employees who are discharged or disciplined in contravention of clear public policy." (1997), 78 Ohio St.3d 134, 155, 677 N.E.2d 308. The same is true of common-law civil remedies. *Kulch* quotes the North Carolina Supreme Court case of *Amos v. Oakdale Knitting Co.* (1992), 331 N.C. 348, 416 S.E.2d 166, in which that court held that the public-policy exception it adopted in a previous case was "not just a remedial gap-filler. It is a judicially recognized outer limit to a judicially created doctrine, designed to vindicate the rights of employees fired for reasons offensive to the public policy of [North Carolina]. The existence of other remedies, therefore, does not render the public policy exception moot." *Id.* at 356, 416 S.E.2d 166.

{¶ 51} There is no evidence that Mantych had agreed to allow Wallace to work the reduced number of hours per week to which his health condition now limits him. Therefore, Wallace cannot prove that he can substantially perform the essential functions of the job from which he was discharged, preventing a judgment against Mantych on Wallace's claim for disability discrimination.