[Cite as *Dotson v. Freight Rite, Inc.*, 2013-Ohio-3272.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

RONALD DOTSON                          :

     Plaintiff-Appellant            :          C.A. CASE NO.    25495

v.                                     :          T.C. NO.    10CV8401

FREIGHT RITE, INC., et al.             :           (Civil appeal from
                                                  Common Pleas Court)
     Defendants-Appellees           :

                                       :

          . . . . . . . . . .

## O P I N I O N

Rendered on the ____26th____ day of ____July____, 2013.

. . . . . . . . . .

FRANK M. PAYSON, Atty. Reg. No. 0055165, 120 W. Second Street, Suite 400, Dayton, Ohio 45402
     Attorney for Plaintiff-Appellant

T. ANDREW VOLLMAR, Atty. Reg. No. 0064033, One Dayton Centre, 1 S. Main Street, Suite 1800, Dayton, Ohio 45402
     Attorney for Defendants-Appellees

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     This matter is before the Court on the Notice of Appeal of Ronald Dotson,

filed November 21, 2012. Dotson appeals from the October 23, 2012 decision of the trial court that sustained Freight Rite, Inc.'s and Brian Beerbower's (collectively, "Defendants") motion for summary judgment. Dotson was formerly employed at Freight Rite, Inc. ("Freight Rite"), and Beerbower, along with John Paden, were co-owners of the company and Dotson's supervisors. Dotson sued Defendants as the result of the termination of his employment. We hereby affirm the judgment of the trial court.

{¶ 2} Dotson filed his complaint against Defendants on October 21, 2010. He asserted therein that he was 55 years old and African-American, and he asserted claims of discrimination based upon race and age; common law discrimination; equitable estoppel; promissory estoppel; wrongful discharge in violation of public policy; breach of the duties of good faith and fair dealing; retaliation; infliction of emotional distress; negligence; and reckless conduct, malice and punitive damages. Against Freight Rite alone, Dotson alleged respondeat superior liability and ratification.

{¶ 3} In their motion for summary judgment, Defendants asserted that Dotson's common law claims failed because R.C. 4112.02 and 4112.99 provided his exclusive remedies. They asserted that they did not discriminate against Dotson on the basis of race or age, and that Dotson was unable to establish a prima facie case of discrimination. Defendants asserted that Dotson was terminated for poor performance. They asserted that Dotson's claims for estoppel were barred because he was an at-will employee, and that his claims for retaliation failed because there was no evidence of discrimination and no evidence that Dotson complained of discrimination. Defendants asserted that Dotson's claim of intentional infliction of emotional distress failed because there was no evidence of extreme or outrageous conduct. They asserted that Dotson's remaining claims lacked factual

support. Finally, Defendants asserted that Beerbower "has no individual liability" for terminating Dotson.

**{¶ 4}** Beerbower's affidavit is attached to Defendants' motion for summary judgment. It provides that he is the owner and Chief Executive Officer of Freight Rite, a 55-employee business that delivers and installs home appliances for companies such as Home Depot and General Electric. Beerbower averred that Freight Rite's principal place of operations is in Toledo, Ohio, and that there is a satellite facility in Vandalia, where Dotson was employed from February, 2008 until April 27, 2010, as manager of the service center. According to Beerbower, at all times, Dotson was an at-will employee.

**{¶ 5}** Beerbower averred that Dotson's management duties included supervising the delivery service, including the drivers and the installers of the appliances. Dotson was required to respond to employee calls, and to aid with installation procedures and problems, according to Beerbower. His affidavit provides that the position required Dotson "to have knowledge of the delivery route, the terms and schedules for each delivery, and the actual appliances," as well as the ability to resolve problems "that might occur in the installation process." Beerbower further averred that the position required Dotson "to have strong communication and leadership qualities, such as trustworthiness, honesty and empathy towards the difficulties the employees met in the field." Further, since deliveries were ongoing throughout the day, Dotson was required to remain "on call" as long as employees remained in the field, "even after his scheduled hours to be in the office."

**{¶ 6}** Beerbower averred that Freight Rite's delivery and installation services are regularly evaluated by "Quality of Service" ("QOS") surveys as follows: "Once an appliance

is delivered and hooked-up, the seller of the appliance asks the consumer to rate Freight Rite's service through a QOS survey. The seller uses the QOS survey to measure the quality of the delivery service. As a manager, Mr. Dotson is responsible for managing his facility's QOS score." Beerbower averred that Freight Rite received "inconsistent" scores under Dotson's management, while the Toledo facility "consistently scores among the best in the region in QOS survey scores." Specifically, Beerbower averred that Marshall Edmondson, a representative of General Electric, a Freight Rite client, "brought the Vandalia facility's low QOS scores to the attention of Freight Rite in the summer of 2009 through various emails, which were sent to John Paden, and which John Paden shared with me." Beerbower averred that Edmondson, in 2009, "also complained to me about Mr. Dotson and the general operation of Freight Rite's Vandalia facility." According to Beerbower, Edmondson requested that Beerbower "consider replacing" Dotson as the manager of the facility. Beerbower averred that Dotson's compensation was comprised of a base salary as well as a bonus "for meeting a certain threshold score on the QOS surveys."

{¶ 7} Beerbower averred that, in 2009, he received complaints from employees at the Vandalia facility that Dotson was intoxicated at work, as well as complaints regarding his management of the facility. Beerbower averred that on one occasion, he himself believed Dotson to be intoxicated, based upon his "slurred speech and inability to articulate coherent thoughts" in the course of a 2009 phone call.

{¶ 8} Beerbower averred that Dotson was required to send Freight Rite paperwork to the Toledo facility by Federal Express on a weekly basis, and that he "routinely omitted important paperwork from the Federal Express shipment, which caused operational delays

and added expense." After several warnings without improvement and "repeated errors" in the weekly shipment, Beerbower averred that he "docked" Dotson's pay.

{¶ 9} Based upon the low QOS scores and the employee and customer complaints he received, Beerbower averred that he "initiated a survey of the Vandalia employees." Beerbower's affidavit provides that he "personally reviewed the employee surveys, many of which specifically identified Mr. Dotson as a significant problem with employee morale, stating that he was a poor communicator, that he lacked field knowledge, and that the employees received more value from Scott Louy, who was another manager at the Vandalia facility."

{¶ 10} Beerbower averred that he met with Dotson in November, 2009, to discuss the surveys. In preparation for the meeting, Beerbower averred that he created a "Manager Evaluation form with specific items to address" with Dotson. After reviewing the form with Dotson, Beerbower averred that Dotson signed it on November 27, 2009. A copy of the form is attached to Beerbower's affidavit. It is divided into two sections, namely "Items of Excellence," under which is a brief list of eight items comprising eight lines, and "Items for Improvement," under which are six detailed items comprising a total of 50 lines. Beerbower averred that during "the evaluation, we specifically discussed the employees' complaints, Mr. Dotson's management of the QOS scores, the complaints of his after-hours management, and the need for him to gain knowledge of what the driver's (sic) did on a daily basis." Beerbower averred that he "restructured" both Dotson's and Louy's compensation "by putting more emphasis on the facility attaining a QOS bonus." Beerbower averred that neither Louy nor Dotson received a QOS bonus in November of

2009, or in January, 2010, based upon the failure of the facility to achieve QOS scores of 94.

{¶ 11} According to Beerbower's affidavit, within a two week span in February, 2010, a dishwasher and a washing machine were misplaced by a service team at the Vandalia facility. During the few days that the washing machine was missing, Dotson was the only manager on duty, and Louy located the washing machine within a half an hour of his return from vacation, Beerbower averred. He further averred, "Dotson seemed oblivious to these problems and he showed little capacity to change. He was so aloof to the problems that in March of 2010, he suggested giving the employees 'a pat on the back' for what he thought was good week." Beerbower averred that Paden denied permission to Dotson to commend the employees.

{¶ 12} Beebower's affidavit provides as follows:

Due to the ongoing poor QOS scores, employee complaints, and the misplaced product, Freight Rite made the decision to terminate Ronald Dotson's employment on April 27, 2010, as part of a management restructuring in April, 2010. After reviewing the various positions and tasks performed by the various employees in the Vandalia facility, the overall Freight Rite management team, including myself and John Paden, determined that the Vandalia facility would operate more efficiently without a general manager position at that facility. Mr. Dotson's job duties involved tasks that Freight Rite's other managers could perform at lower cost and with greater efficiencies to Freight Rite. At the same time Mr. Dotson was terminated,

Freight Rite restructured the Vandalia management team, dividing Mr. Dotson's job duties between three lower-level managers and John Paden. Mr. Dotson was not replaced, rather, his General Manager position was eliminated, and his job duties redistributed to other employees.

{¶ 13}  Beerbower averred that Freight Rite has seven employees over the age of 40, three of whom are between the age of 50 and 55, as well as six non-Caucasian employees. He averred that Dotson was not terminated based upon his age or race, and that Dotson never advised him that "he was treated differently by any of his co-workers or Freight Rite management because of his age or race."

{¶ 14}  Beerbower averred that in 2008, he interviewed "a number of candidates for the general manager position," and that he hired Dotson "over several younger, Caucasian candidates," due to the fact that Dotson "represented himself as qualified during the application process, with general management and logistics experience."  According to Beerbower, he "later found out [Dotson] did not have the needed skills for the job, such as appliance installation skills, and employee relation skills."  Beerbower averred that the decision to terminate Dotson was "based on my interaction with and observation of Mr. Dotson and repeated customer and employee complaints to myself and John Paden about Mr. Dotson's treatment of the employees, failure to get along with customers, inability to address the delivery technician's concerns while out in the field, and overall poor quality of his work."  Finally, Beerbower averred that Dotson "developed an employee point discipline system for Freight Rite" that was never utilized for managers, including Dotson and Louy.

{¶ 15}  Also attached to Defendants' motion for summary judgment is the affidavit of John Paden.  Paden averred that he is the Chief Operations Officer of Freight Rite, and that he supervised Dotson.  Paden's averments regarding communications received from Marshall Edmondson regarding the Vandalia facility's QOS scores are consistent with Beerbower's. Email correspondence, from Edmondson to Paden and Beerbower, regarding the low scores, email correspondence from Paden to Dotson and Louy, regarding the low scores, and Paden's email response to Edmondson regarding the scores, are attached to Paden's affidavit.  Paden further averred that he received a phone call from Edmondson in May, 2009, "about the low QOS scores from General Electric customers" in the Vandalia facility's territory.  A May 20, 2009 email, from Paden to Dotson and Louy, regarding Edmondson's call, is attached to the affidavit.  Paden, like Beerbower, also asserted that a washing machine was misplaced in February, 2010, while Louy was on vacation, and that Dotson "was unable to locate the machine for a few days."  Paden averred that he participated in the decision to terminate Dotson, and that the decision was not based upon Dotson's age or race.  Finally, Paden averred that Dotson never made him aware of any discriminatory treatment directed toward Dotson by any co-workers or managers based upon his race or age, and that Paden was not aware that any employees "made racial or age-based comments" to Dotson.

{¶ 16}  Finally, attached to the motion for summary judgment are the affidavits of Barry Gilmore, Brandon Johnston, Charles Kinsel, Brian Greenspan and Larry Ary.   Each of them averred that he was employed at Freight Rite during Dotson's and Louy's employment and directly supervised by Dotson and Louy.   Attached to each affidavit is each

employee's individual "Team Evaluation," all of which were completed in the Fall of 2009, as set forth in Beerbower's affidavit. The preamble to the evaluation provides in part as follows: "This is an operational evaluation to be filled out by all team members of Freight Rite in order to assess the strengths and weaknesses of our Vandalia operation. * * * Your honest and thoughtful responses are necessary to assist in building the best team possible, so PLEASE complete this evaluation thoroughly and truthfully." The evaluation contains 27 questions covering several areas of operation within the facility.

{¶ 17} Question 18 of the evaluation asked the employees to identify a manager(s) who provides helpful answers and resolves problems, while question 19 asked the employees to identify a manager(s) who is not approachable, not helpful and who lacks knowledge to assist with problem resolution. Each of the attached evaluations identifies Louy in question18 and Dotson in question 19. For example, Kinsel's evaluation provides that Dotson "does not seem to have previous field" experience to assist with deliveries and problems, and that Dotson "is a very difficult person to deal with." Johnston's evaluation provides that Dotson has "no communication skills."

{¶ 18} Dotson's affidavit is attached to his memorandum in opposition to Defendants' motion for summary judgment. According to the affidavit, Dotson "was the only black manager ever employed by Freight Rite, Inc. at either its Toledo or Vandalia, Ohio locations. Everyone else is white." Dotson further averred that he was the only manager over 40 at Freight Rite in either of its locations, and that he was "age 55 at the time of the occurrences in my Complaint." Dotson averred that both Beerbower and Paden are white and in their 30's. According to Dotson, "Louy replaced me as General Manager of the

Vandalia operation for Freight Rite, Inc. after I was terminated. He is white and he was 31 years old at the time." Dotson further averred that when Freight Rite "acquired the Vandalia operation and contract it also had to absorb about a dozen of the former operation's employees, some of whom had caused that previous operation to lose their contract because of behavior problems and installation problems."

{¶ 19} Dotson averred that he has an "extensive logistics background." Attached to his affidavit is correspondence from Emery Worldwide, Keystone Foods, and Transfreight confirming his prior employment. Dotson asserted that "the Vandalia operation out-performed Toledo in terms of financial performance during my tenure as General Manager."

{¶ 20} Dotson further averred as follows:

When I was General manager at Vandalia I continually received mixed messages [from] Beerbower and Paden. Beerbower wanted me to interact more with the drivers/installers and compliment and award them and encourage their performance. But when I tried to do so because of excellent QOS performance by some of the employees John Paden stopped me and would not let me compliment or award them.

{¶ 21} Dotson asserted that he was repeatedly complimented by Beerbower on his performance at Freight Rite, and he attached correspondence from Beerbower to him and Louy regarding their receipt of a "2008 QOS Bonus," and thanking them for "all of your hard work and efforts," as well as email correspondence, dated January 21, 2010, which provides in part, "Despite the issues your location had with QOS in the 4th quarter, you still

pulled out a strong and successful year-end score. Overall, 2009 was a HUGE success for you guys, and I am very proud!!!" Dotson also attached his performance evaluation dated November 18, 2009. Dotson asserted that he "exceeded all QOS requirements for the full years of 2008 and 2009."

{¶ 22} Regarding his development of Freight Rite's disciplinary program, Dotson averred that Beerbower advised him that he was a "significant contributor" to the program, and that the system "applied to all [Freight Rite] employees, including managers, whether based in Toledo or Vandalia." Dotson attached a copy of the "Freight Rite, Inc. Employee Policies and Disciplinary Procedures" to his affidavit. It provides in part that Freight Rite "utilizes a point system by which all actions, behaviors and requirements are rated. The accumulation of points by an employee is strongly discouraged, and all employees should be aware that the accumulation of points can and will lead to [progressive] disciplinary action." The policy provides that the accumulation of five points in a rolling six-month period will result in termination. Dotson asserted that he never accumulated five points within any rolling six-month period.

{¶ 23} Dotson asserted that he "complained about the unequal treatment I received and the harassment by manager" Louy to Beerbower in February and July of 2009, "but he and the company refused to take any action to protect me." Upon his termination, Dotson asserted that the "only reason given" was that Beerbower and Freight Rite wanted to "'establish a new culture' at Vandalia. The change brought about an all white under the age of 40 management team. * * * Culture to me implicates race and that is how I understood the comment."

{¶ 24} Dotson attached a copy of his job description to his affidavit, and he asserted that one "of the essential management responsibilities I had was truck routing, and it required specialized training. Brian Beerbower permitted Scott Louy to have this training but would not permit me to have the training. This lack of training inhibited my advancement opportunities with the company and affected negatively my job performance."

{¶ 25} Doston asserted that a "DOT physical" was a requirement of the job, and that he witnessed "Louy refuse to obtain an update for a DOT physical" in an "open defiance of authority." Dotson asserted that he witnessed Louy "being directly insubordinate" to Beerbower without resulting discipline. Dotson asserted that he observed Louy "being given the time to accompany drivers in the field and I was not. Yet Defendants complained that I failed to exhibit initiative by not accompanying drivers in the field." Dotson asserted that Louy refused to investigate a property damage claim as directed, "and this behavior was permitted." According to Dotson, in January, 2010, Louy "was permitted to renew his employee ID but I was not allowed to do this." According to Dotson, he "was allegedly fired at least partially because of inconsistent QOS scores for the Vandalia operation, even though [Louy] was not fired and he was responsible for exactly the same scores."

{¶ 26} Dotson averred that Beerbower "stated to me that 'you need to get to know your workers and adjust your style' which I understood, inasmuch that all the drivers/installers were white, to mean I needed to act more white. I was offended by this comment." Dotson averred that Beerbower acknowledged in his deposition that Dotson complained to him.

{¶ 27} Regarding the employee surveys attached to Defendants' motion for

summary judgment, Dotson averred that he has had to counsel Gilmer, Johnston, Kinsel, Greenspan and Ary "for work related issue or performance problems, and thus they would have a motive to offer a false statement and denigrate me if they had the chance, as they did with the employee surveys." Dotson averred that Freight Rite failed to include surveys favorable to him from other employees. According to Dotson, Beerbower advised him "that Scott Louy lacked people skills and was confrontational with employees. And yet Scott Louy retained his job."

{¶ 28} Dotson averred that he never consumed alcohol while at work or on call. According to Dotson, the "allegations that I sounded intoxicated were either made up statements for a negative purpose, or perhaps the reporters were not aware that I at the time was on a number of medications that made one slower and somewhat drowsy." Finally, Dotson asserted that at the time of his interview for the manager position at Freight Rite, Beerbower "made the comment in my presence that this was a physical job and he wondered if I could to the job because of my age. I was offended."

{¶ 29} Also attached to Dotson's memorandum in opposition is the affidavit of Dr. James Barna, which provides that he "observed and assessed" Dotson, and that it is his opinion to a reasonable degree of psychological certainty that Dotson suffers from an adjustment disorder with mixed anxiety and depressed mood, which is chronic and severe. According to Barna, Dotson's emotion distress "was the direct result of, and directly caused by," Defendants' "discriminatory and retaliatory and harassing conduct" directed towards Dotson.

{¶ 30} Defendants filed a reply to Dotson's memorandum, in which they asserted in

part that Dotson made numerous false statements in his memorandum that are not supported by the record. Defendants further asserted that there was no proof that Dotson "was qualified for his position or that he was replaced by a Caucasion worker under age 40." Defendants asserted that there was no evidence that Freight Rite treated Scott Louy "any better than" Dotson.

{¶ 31} We note that Beerbower's and Dotson's depositions are also part of the record before us.

{¶ 32} In sustaining Defendants' motion for summary judgment, the trial court determined that there "is no genuine issue of material fact that Plaintiff can point to whereby he could establish the Defendant discriminated against him based on age, race, or any reason other than poor performance." The court concluded that "Defendant is entitled to summary judgment on Plaintiff's claim of common law discrimination" because Dotson's exclusive remedy is provided by statute. The court found that Defendant was entitled to summary judgment on Dotson's age and race discrimination claims, since Dotson "has not presented direct evidence of intentional discrimination by Defendants," and further that Dotson did not establish a prima facie case of discrimination by means of circumstantial evidence. The court noted that while Dotson was a member of a protected class, was discharged, and was qualified for the manager position "[o]n paper," Defendants "demonstrated to this Court that his poor performance negated those qualifications." The court further concluded that "Defendants have produced sufficient evidence to prove that [Dotson's] duties were redistributed among existing employees," and that Dotson was accordingly not replaced. The court concluded that "no genuine issue of material fact exists as to the third and fourth[]

element[s] of the prima facie test for age discrimination and Defendants are entitled to judgment as a matter of law on [Dotson's] age and race discrimination claims." The court next noted that even if Dotson established a prima facie case of discrimination, he was terminated for poor performance, "which is a legitimate, non-discriminatory reason."

{¶ 33} The court determined that Dotson's claims for estoppel failed because he was an at-will employee, and Defendants did not promise future employment. The court found that Dotson's claims of retaliation failed because there was no discrimination and Dotson failed to "show evidence that he complained of discrimination to anyone." The court found that Dotson's claim of intentional infliction of emotional distress failed "because there was no extreme or outrageous conduct engaged in by any Freight Rite employee." The court further found that there was "no factual basis for the remaining claims of breach of the duty to act in good faith and fair dealing, wrongful discharge, negligence, respondeat superior and reckless conduct," each of which "derivative" claim is dependent upon a finding of discrimination. The court found that "Beerbower did not employ [Dotson], and as a result has no individual liability for [his] termination. Therefore, * * * Beerbower is entitled to summary judgment on all claims on this basis as well." The court found that certain pending liminal motions were rendered moot by its decision, and it ordered that "Defendants' costs are to be paid by Plaintiff."

{¶ 34} Dotson asserts five assignments of error. We will address Dotson's third assigned error first for ease of analysis. It is as follows:

"THE TRIAL COURT ERRED WHEN IT CONSIDERED TEAM EVALUATIONS."

Dotson asserts that he moved the trial court to exclude the employee surveys from trial on October 21, 2012 "because they lacked relevance under R.Evid. 402 to prove age and race discrimination" * * * "but are instead merely a popularity contest." He asserts that in granting summary judgment, the trial court "relied heavily on the comments made in the 'Employee Surveys' to determine that Plaintiff was not qualified for his position." Defendants reply that they "considered the surveys in evaluating the Plaintiff's effectiveness as a manager. The surveys show additional age and race neutral bases for Freight Rite's employment decision."

Civ.R. 56(E) specifies the types of evidence a party may use to support or oppose summary judgment as follows: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit."

{¶ 35} The affidavits and authenticated surveys are competent summary judgment evidence pursuant to Civ.R. 56(E). Further, contrary to Dotson's assertion, it is not evident that the trial court "relied heavily" upon them in its decision; the trial court made no mention of the surveys in the entirety of its decision. Dotson's third assigned error is overruled.

{¶ 36} We will next consider Dotson's first assigned error, which is as follows:

"THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF BY INCORRECTLY EXCUSING BRIAN BEERBOWER, PLAINTIFF'S SUPERVISOR, FROM ALL LIABILITY IN DECIDING THAT HE DID NOT MEET THE

STATUTORY DEFINITION OF EMPLOYER."

{¶ 37} Dotson asserts that "Beerbower is an employer because he acted in the instant case directly and indirectly in the interests of Freight Rite, Inc. in his dealings with Plaintiff. Further, Ohio law is clear that liability may be imposed against supervisors and managers in their individual capacity * * * ." Defendants concede that Beerbower "meets the definition of an employer found in R.C. § 4112 for purposes of a discrimination case," but they further assert that since Beerbower did not discriminate against Dotson, the grant of summary judgment in his favor is proper.

{¶ 38} R.C. 4112.01(A) provides: "(2) 'Employer' includes the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." We agree with Dotson, and Defendants, that Beerbower is an employer within the meaning of R.C. 4112.01(A)(2). However, this error by the trial court is not prejudicial to Dotson; for the reasons set forth below under assignments of error two and four, the error does not alter the outcome of the grant of summary judgment in Beerbower's favor. Dotson's first assigned error is overruled.

{¶ 39} We will next consider Dotson's fourth assignment of error, which is as follows:

"THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S RACE, AGE, RETALIATION, AND EMOTIONAL DISTRESS CLAIMS."

{¶ 40} According to Dotson, he established a prima facie case of race and age

discrimination, and Freight Rite's reason for terminating him, namely his poor performance, was pretextual for discrimination. Regarding his retaliation claim, Dotson asserts that he "did engage in the requisite protected activity by complaining several times to Beerbower" about "unequal treatment." Finally, Dotson asserts that the trial court erred in finding that there was no extreme or outrageous conduct directed at him by Defendants.

{¶ 41} As this Court has previously noted:

Summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co., Inc.*, (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46; citing Civ. R. 56(C).

Upon a motion for summary judgment, the initial burden is on the moving party to show that there is [no] genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-93, 662 N.E.2d 264. Once a moving party satisfies its burden, "the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings." *Murphy v. McDonald's Restaurants of Ohio, Inc.*, Clark App. No.2010-CA-4, 2010-Ohio-4761, at ¶ 13, citing *Dresher*, 75 Ohio St.3d at 292-93, 662 N.E.2d 264. "Rather, the burden then shifts to the non-moving party to respond, with affidavits or as otherwise permitted by Civ. R. 56, setting forth specific facts which show that

there is a genuine issue of material fact for trial." *Id*. "Throughout, the evidence must be construed in favor of the non-moving party." Id. *Steve Zell Farm Equip., Inc. v. Wagner*, 2d Dist. Miami No. 2010 CA 1, 2010-Ohio-5902, ¶ 9-10.

**{¶ 42}**   As this Court has further noted:

Appellate courts review a trial court's entry of summary judgment de novo. *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993). "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119-120, 413 N.E.2d 1187 (1980). *PNC Bank, N.A. v. Craig*, 2d Dist. Montgomery No. 25010, 2012-Ohio-5410, ¶ 5.

### Race and Age Discrimination Claims (Counts I & II)

**{¶ 43}**   R.C. 4112.02(A) provides:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age [1], or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that

---

[1] R.C. 4112.14(A) identifies persons over the age of 40 as the class protected by R.C. 4112.02.

person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

**{¶ 44}**  As this Court has previously noted:

Absent direct evidence of discrimination, a prima facie case of discrimination is established when a plaintiff demonstrates (1) that he or she is a member of a protected class, (2) that he or she was subjected to an adverse employment action, (3) that he or she was qualified for the position, and (4) that someone outside the class was treated more favorably or replaced the plaintiff. *Talley v. Bravo Pitino Restaurant Ltd.* (C.A.6, 1995), 61 F.3d 1241, 1246, citing *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, and *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582.  *Jackson v. Internatl. Fiber*, 169 Ohio App. 3d 395, 402-03, 2006-Ohio-5799, 863 N.E.2d 189, 195, ¶ 32 (2d Dist.).

**{¶ 45}**  As this Court has further noted:

In the context of a defendant's Civ.R. 56(C) motion for summary judgment proceeding, and after the plaintiff has pointed to evidence that satisfies the [prima facie case], the defendant may overcome the discriminatory presumption which the factors establish by "propounding a legitimate, nondiscriminatory reason for plaintiffs' discharge. (Then), the plaintiff must ... show that the rationale set forth by defendant was only a pretext for the unlawful discrimination." *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 503, 575 N.E.2d 439, quoting *Barker v. Scovill.  Risley v.*

*Comm Line, Inc.,* 2d Dist. Miami No. 02CA42, 2003-Ohio-2211, ¶ 20.

**{¶ 46}** Regarding the third element of the prima facie case, we agree with the rationale of the Eighth District as follows:

> In order to establish the "qualified" element of the prima facie case, [Dotson] must prove he was performing to the company's satisfaction, under Ohio Law. In *Smith v. Greater Cleveland Regional Transit Auth.* (May 24, 2001), Cuyahoga App. No. 78274, [the Eighth Distirct] stated, "to demonstrate qualification for a position a litigant must not only demonstrate the capability of performing the work, but must also demonstrate that he or she is meeting the employer's legitimate expectations." *Wilson v. Precision Envtl. Co.*, 8th Dist. Cuyahoga No. 81932, 2003-Ohio-2873, ¶ 31.

**{¶ 47}** Further,

> When confronted with defendant's motion for summary judgment cataloging the numerous documented instances of dissatisfaction with plaintiff's performance level, the burden [is] upon plaintiff to come forward with affidavits or other acceptable forms of admissible evidence to contradict or rebut the employer's history of frustration and dissatisfaction with his work and attitude.
>
> * * *
>
> Whether an employer is qualified or not is measured at the time the decision to terminate is made.* * *. *Neubauer v. A.M. McGregor Home Corp.*, 8th Dist. Cuyahoga No. 65579, 1994 WL 197221 (May 19, 1994).

{¶ 48}    Dotson's complaint established that he was a member of two statutorily protected classes, age and race, and that he was subject to an adverse employment action, termination. Dotson asserts in his brief that he was qualified for the position for the following reasons:

1) He was told by Paden and Beerbower that he was hired because of his extensive logistics background. * * * 2) The Vandalia start-up proved to be a success. * * * 3) Plaintiff successfully managed Freight Rite Vandalia and received numerous compliments on his performance. * * * 4) Beerbower stated at his deposition that Plaintiff was at all times fully qualified for his position with Freight Rite. * * * 5) John Paden at his deposition stated when asked: Q. When you hired Ron Dotson, did you believe him to be qualified for his position?   A.   Yes.

{¶ 49}    The following exchange occurred in Beerbower's deposition:

Q. You [hired Dotson] because of his background, specific background in this kind of business?

A.   Correct.

Q.   And you were impressed with his background?

A.   Correct.

Q.   You felt he was qualified for the job you hired him for at Freight, correct?

A.   Based on his interviews and resumes, we felt he is qualified.

Paden also indicated in his deposition, a portion of which is attached to Dotson's

memorandum in opposition to summary judgment, that he believed Dotson was qualified at the time he was hired.

{¶ 50} As noted above, Beerbower averred in his affidavit that he "later found out [Dotson] did not have the needed skills for the job, such as appliance installation skills and employee relation skills." Beerbower further testified at deposition that "over the big picture, the course of the two years, I felt that he performed poorly in the duties we requested." Beerbower testified, "we continually worked with Ron and what I guess you could label as counseling, and training, trying to get him to perform at the level we needed him to perform for his position." Beerbower acknowledged that he complimented Beerbower and Louy for the facility's QOS scores, and that while there were a couple of incidents in a two year period where the scores were not achieved, that Dotson and Louy achieved the requisite scores the majority of the time. Beerbower testified, however, that his "displeasure" regarding the QOS scores related to the management of their achievement and not the scores themselves.

{¶ 51} Regarding Dotson's assertion that Beerbower refused to train him on truck routing, Dotson asserted in deposition, "* * * that routing job seemed to be held for white males under forty. I'm fully capable of doing it, never allowed to do it, never allowed to be trained for it." When asked why Louy was trained on routing and Dotson was not, Beerbower indicated at deposition that Louy had already received training at the Toledo facility, and he further indicated as follows:

> * * *In the first side of it, Ron, when we set up the hierarchy, it was
> our intent and our hope that Ron would primarily work in the same capacity

that John Paden does for our Toledo operation, and that Scott would primarily work in the capacities that I do for the  - - or I did for the Toledo operation. It was our hope that we could eventually cross-train them both in each other's activity, because John and I had to do that when our company was smaller. And the problem was we could never get Ron to fully grasp or pick up or become efficient or proficient in the core activities that we intended for his position.

So if someone can't even grasp those activities, you're not going to move them over to what is probably one of the most critical daily activities going on, which is your routing

He would also not become proficient in field knowledge, or make an effort to become proficient in field knowledge, and field knowledge is critical to routing.

**{¶ 52}** As noted above, in 2009, according to Beerbower, after Doston had been employed at Freight Rite for over a year, there were numerous employee complaints about Dotson's management of the facility, as well as complaints from Marshall Edmondson of General Electric. Beerbower in turn surveyed his Vandalia employees. According to Beerbower at deposition, the "preponderance of the responses were negative to Ron; a very minimal amount of responses were negative to Scott." Regarding the Manager Evaluation that Beerbower reviewed with Dotson, in November, 2009, Beerbower testified, Ron had a history of demeaning employees, making employees feel undeserving to be there; making employees feel that they didn't have value in our company. * * * It doesn't matter what your

responsibilities are; we're all part of the same team and deserve the same dignity and respect." Beerbower described it as a "review spurred on by necessity, because we were having problems at the location," and he stated that "the intent of the review was to direct [Dotson] in correcting those actions with positive feedback." When asked why the employee discipline program was not applied to Dotson, Beerbower replied, "We never in our company's history and to this date have never applied a demerit point system for managers." According to Beerbower, "We worked with Ron continually over two years trying to find a place for him of value in our company. And I'm trying to allow him to demonstrate value. And eventually became exhausted at the task."

{¶ 53} Regarding the allegations of Dotson's intoxication, Beerbower stated that he received multiple complaints from employees on the issue in addition to his own experience with Dotson on the phone. After receiving a report from Josh Banks, a general labor employee, about a "detailed experience" in which he "perceived Ron was intoxicated," Beerbower stated that he confronted Dotson, and that Dotson did not admit or deny the allegations. Beerbower stated that the allegations of intoxication were "one more link in the chain of questioning Ron's credibility, reliability, dependability, and his overall capacity to act as a general manager for us."

{¶ 54} Regarding the missing washing machine, Dotson testified at his deposition that he did not recall the incident. In his brief, however, he speculates as follows: "Could Louy have hidden or otherwise assured that the washer could not be located, all the while knowing himself of its location, to embarrass Plaintiff in the eyes of Beerbower?"

{¶ 55} The following exchange occurred in Beerbower's deposition regarding

Dotson's termination:

Q. On the day you fired him, * * * isn't it true that you * * * didn't give him any reason for the termination, other than you wanted to establish a new culture?

A. That would be a misquote of my words.

Q. You didn't use the word[s] "new culture"?

A. No.

Q. What did you say?

A. We told him that we wanted to change the management style.

* * *

Q. What management style did you want?

A. Someone who didn't talk down to the employees, and someone that actually completed all their responsibilities correctly.

{¶ 56} Regarding Dotson's assertion that the Vandalia facility was successful, Beerbower testified that "the fact that Vandalia was performing higher in revenue than Toledo has nothing to do with QOS. It has to do with the size, the geographic size of the territory. Mr. Dotson had nothing to do with the geographic size of the territory."

{¶ 57} In Dotson's deposition, when asked about his experience in the home appliance delivery business prior to his employment at Freight Rite, Dotson indicated that he had "[n]one." He stated that he had never worked for a company that did electrical or plumbing work, and he acknowledged that field knowledge was important in answering the questions of the drivers and installers in the field. Dotson also acknowledged in his

deposition that he was not singled out or treated differently from Louy for failing to achieve the QOS score in November, 2009.

{¶ 58} Regarding the employee surveys, when asked why the comments as to Louy's performance were "so much different" from the comments addressed to his own, Dotson replied, " Suppositions could be because Scott's white. I'm black. These guys are mostly - - all these guys were under forty, predominately under forty. Scott liked certain music. Maybe they liked certain music. Maybe there's common themes. Maybe they had more to talk about afterwards, I don't know." Dotson acknowledged that Beerbower discussed with him his need to improve his field knowledge and employee relations.

{¶ 59} The following exchange occurred:

Q. During your employment at Freight Rite, did Brian Beerbower say anything to you that led you to believe that any of his employment decisions with respect to you were based on your race?

A. No.

Q. During your employment at Freight Rite, did Brian Beerbower ever say anything to you that led you to believe that any of his employment decisions with respect to you were based on your age?

A. No.

Q. During your employment at Freight Rite, was any other employee promoted, advanced, bonused, raised, treated positively in any way based on being a different race than you?

A. I don't follow your question.

Q. I'm asking whether there was somebody who was given a raise, promoted above you, something like that that you believe was based on their being a different race than you?

A. Not to my knowledge, no.

Q. And then the same question except with respect to age. Was there ever an employee that was either bonused, raised, or promoted above you during your time at Freight Rite where you believe that was done as a result of the employee's age?

A. No.

{¶ 60} Finally, Dotson acknowledged in his deposition that he neglected to include certain important paperwork in Federal Express shipments on more than one occasion, as Beerbower averred in his affidavit. While Dotson averred in his affidavit that Louy refused to get a physical and inspect property damage as directed by Beerbower, in his deposition he testified that Louy ultimately complied with Beerbower's directions.

{¶ 61} Construing the evidence in a light most favorable to Dotson, as did the trial court, we conclude that Dotson was not qualified for his position and that he accordingly failed to satisfy the third element of his prima facie case. The positive comments about his qualifications that Dotson cites above were made when he was hired, based upon his representantions, not at the time of his termination, when his qualifications for the position are measured. Beerbower received multiple internal and external complaints regarding Dotson's performance, and he conducted an investigation which confirmed the allegations in the complaints. Dotson failed to meet his employers' legitimate expectations, and he failed

to provide anything other than "supposition," speculation, and self-serving conclusory assertions to refute the numerous negative comments about his performance.

**{¶ 62}** Since Dotson failed to raise a genuine issue of material fact regarding the third element of his prima facie case, we need not determine whether or not he was replaced, pursuant to the fourth element. Accordingly, we conclude that the trial court properly granted summary judgment on his claims of discrimination based on age and race. We finally, note, as did the trial court, that even if we were to conclude that Dotson established a prima facie case of discrimination, Defendants articulated a legitimate, non-discriminatory reason for his termination, namely Doston's poor performance as a manager. *See, Putney v. Contract Bldg. Components,* 3d Dist. Union No. 14-09-21, 2009-Ohio-6718, ¶ 44 (inability to perform job in a satisfactory manner, as established by affidavits and documentation, is a legitimate, nondiscriminatory reason for termination.*)*

### Retaliation (Count VIII)

**{¶ 63}** In his brief, Dotson directs our attention to paragraph 21 of his affidavit, which provides that he complained repeatedly to Beerbower about the way Louy treated him.

**{¶ 64}** As this Court has noted:

> Division (I) [of R.C. 4112.02] makes it unlawful for an employer "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." As when proving a violation of

division (A), to prove that an employer violated division (I), a plaintiff has the initial burden to establish a prima-facie case. A prima-facie case of retaliation consists of four essential elements: "(1) [the claimant] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, at ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.* (C.A.6, 1990), 903 F.2d 1064, 1066. *Wallace v. Mantych Metalworking*, 189 Ohio App. 3d 25, 36, 2010-Ohio-3765, 937 N.E.2d 177, 186, ¶ 30 (2d Dist.).

**{¶ 65}** In his deposition, Dotson testified that he believed that Louy was prejudiced against him because of his age and race, and the following exchange occurred:

Q. What did Scott Louy do that you believe was evidence of his bias or prejudice because of your race and age?

A. Offered tremendous resistance in terms of lack of cooperation to the extent where it bothered me enough that I left the building in the summer I believe of 2009 and called Brian Beerbower to alert him to the fact that this could not continue the way it's going with Scott offering resistance and combativeness and the hostility towards me, and I didn't appreciate it.

* * *

Q. Did you ever complain to anyone at Freight Rite that you felt you

were being discriminated against?

A.   Yes.

Q.  To whom did you make the complaint?

A. Brian Beerbower

* * *

Q.   What was your complaint?

A.   Regarding my treatment, regarding the hostility and so forth that was being directed toward me from Scott Louy.

Q.   Tell me specifically what you said.

A.   I just remember - - I can't remember specifics.  I just remember that the essence was - of the conversation was that I felt strong hostility, lack of cooperation, and just general uncooperativeness toward me, and there was no reason for it in my mind other than the fact that I was different from him. I was not white and I was over forty.

Q.   Did you say all those things to him?

A.   *I didn't say those things to Brian*.

Q.   Tell me what you said.

A.   *  *  *  The  gist  was  there  was  hostility,  there  was uncooperativeness, there was combativeness.  It had been ongoing.  It had gotten me to the point I couldn't take it any longer; it couldn't continue. That's the essence. (Emphasis added).

{¶ 66}   By his own testimony, Dotson did not engage in the type of protected

activity that R.C. 4112.01(I) prohibits; he merely complained to Beerbower that Louy was uncooperative, not that he discriminated against him based upon his age or race. Dotson's testimony is consistent with the averments in Beerbower's and Paden's affidavits that Dotson never complained to them that any of his co-workers discriminated against him on the basis of his age or race. Construing the evidence most strongly in favor of Dotson, we conclude that he failed to raise a genuine issue of material fact regarding his retaliation claim.

### Intentional Infliction of Emotional Distress (Count IX)

{¶ 67} Dotson's brief contests the trial court's determination that he failed to raise a genuine issue of material fact as to this claim, and he vaguely asserts that in previous sections of his brief he directed our attention to instances of "racially tinged remarks being made by Beerbower" in Dotson's presence. We assume that he refers to assertions that Beerbower advised him to "get to know your workers and adjust your style," which Dotson interpreted to mean that he "needed to act more white," and his assertion that Beerbower advised him at termination that he intended to "establish a new culture" at Freight Rite, a comment which implicated race, according to Dotson. Dotson also argues herein that his termination under the circumstances "might be considered by a jury to be extreme and outrageous conduct."

{¶ 68} As this Court has noted:

> To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that;
>
> (1) the defendant either intended to cause emotional distress or knew

or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency"; (3) the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it." A claim for intentional infliction of emotional distress must be based on more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Citations omitted.) *Harsh v. Franklin,* 2d Dist. Montgomery No. 24331, 2011-Ohio-2428, ¶ 20. *Clinton v. Faurecia Exhaust Sys., Inc.*, 2d Dist. Miami No. 2012-CA-1, 2012-Ohio-4618, ¶ 73.

**{¶ 69}** As this Court has noted, Ohio recognizes employment-at-will and, "unless otherwise agreed, either party to an oral employment-at-will employment agreement may terminate the employment relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing, Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), syllabus. *Easterling v. Ameristate Bancorp, Inc.*, 2d Dist. Montgomery No. 23980, 2010-Ohio-3340, ¶ 44. A previous supervisor and employer are not liable for damages for the intentional infliction of emotional distress allegedly caused by an employee's termination from his at-will employment. *Vickers v. Wren Industries, Inc.,* 2d Dist. No. 20914, 2005-Ohio-3656, ¶ 59.

**{¶ 70}** Construing the evidence most strongly in favor of Dotson, we agree with the trial court that Dotson failed to raise a genuine issue of material fact regarding extreme and outrageous conduct. Dotson himself testified that he did not believe that any of

Beerbower's employment decisions with respect to him in the course of Dotson's employment were based upon his race (or age). Construing the evidence in a light most favorable to Dotson, Beerbower's comments are race (and age) neutral and do not exceed all possible bounds of decency. Finally, Defendants' conduct in terminating Dotson's at-will employment was based upon his poor performance as a manager and cannot serve as the basis for a claim of intentional infliction of emotional distress. There being no merit to Dotson's fourth assignment of error, it is overruled.

**{¶ 71}** We will next consider Dotson's second assigned error, which is as follows:

"THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CLAIMS NOT PROPERLY ADDRESSED BY DEFENDANTS."

**{¶ 72}** Dotson asserts that Defendants "failed to address or challenge" his claims of wrongful discharge in violation of public policy, equitable and promissory estoppel, duty of good faith and fair dealings, negligence, and respondeat superior/ratification. We disagree.

**{¶ 73}** Regarding Dotson's claim of wrongful discharge in violation of public policy, his complaint alleged in Count VI that a "clear public policy exists, and is manifested in Ohio statutes or administrative regulations, or in the common law, against terminating an employee who exercises his right to complain to management when subjected to workplace age and race discrimination and unlawful harassment," and he cited R.C. 4112 et seq.

**{¶ 74}** In their motion for summary judgment, Defendants expressly asserted that "[i]n Counts VI and VIII of his Complaint, [Dotson] alleged that Freight Rite and Beerbower

'retaliated' against him for complaining of discrimination." The trial court noted in a footnote that Defendants adequately addressed this claim in their motion, and we agree. For the reasons set forth above addressing Dotson's retaliation claim, the trial court properly granted summary judgment in favor of Defendants on this claim.

**{¶ 75}** Regarding Dotson's claims of equitable and promissory estoppel, Dotson asserts that Beerbower's "reference" in his affidavit that Dotson was an employee at-will is "insufficient under summary judgment law to shift the burden of production," such that Defendants were not entitled to summary judgment on these claims.

**{¶ 76}** As this Court has previously noted:

> * * * under certain conditions, an employment-at-will relationship may be considered to be modified or altered such that the employer's right to peremptorily discharge an employee is limited. These limitations, i.e. exceptions to the employment-at-will doctrine, are enumerated in *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100. Under the first exception, employee handbooks, company policy, and oral representations may be sufficient to create implied or express contractual provisions that alter the terms for discharge. Under the second exception, an employer's right to discharge may be limited by representations or promises made to the employee which fall within the doctrine of promissory estoppel. Id. at 103-104. *Young v. Hobart Bros. Co.*, 2d Dist. Miami No 89-CA-63, 1991 WL 3843 (Jan. 14, 1991).

**{¶ 77}** As this Court has further noted:

Promissory estoppel is an equitable doctrine. It applies when no contract has yet been formed, but a promise is made which the promisor reasonably should expect to induce action or forbearance on the part of the promisee, and which does induce such action or forbearance. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 483 N.E.2d 150. The promise will be held to be binding if injustice can be avoided only by its performance. *Id.* If the promise is not then performed, the promisee is entitled to specific performance and/or damages. *Walker v. Univ. Med. Servs.*, 2d Dist. Montgomery No. 20141, 2004-Ohio-1321, ¶ 14.

**{¶ 78}** "There is no question that, standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship." *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St. 3d 131, 135-36, 543 N.E.2d 1212, 1216 (1989).

**{¶ 79}** As the trial court found, and Defendants asserted, Dotson was an at-will employee under Ohio law, and he failed to raise a genuine issue of material fact with any evidence of a contract or a promise of continued employment. Accordingly, the trial court properly granted summary judgment in favor of Defendants on Dotson's estoppel claims.

**{¶ 80}** Regarding Dotson's remaining claims of failure to comply with the duties of good faith and fair dealing, negligence, and respondeat superior/ratification, we note that Defendants asserted below that these claims lacked factual support and "just do not apply to our case." Since discrimination is not shown, we agree that Dotson's remaining claims[2],

---

[2]We note that Dotson does not herein address his claim for reckless

which are derivative in nature, fail as well, and in the absence of a genuine issue of material fact, the trial court properly granted summary judgment to Defendants on these claims. Dotson's second assignment of error is overruled.

**{¶ 81}** Finally, Dotson's fifth assignment of error is as follows:

"THE TRIAL COURT ERRED IN REQUIRING PLAINTIFF TO PAY DEFENDANT'S COSTS."

**{¶ 82}** We note that Defendants did not respond to Dotson's final assignment of error.

**{¶ 83}** Civ.R. 54(D) governs costs and provides: "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

**{¶ 84}** Dotson asserts that Civ.R. 54(D) applies "only to the prevailing party," and that since this matter is pending on appeal, "it would be difficult to understand that the Defendants in the instant case are prevailing parties inasmusch (sic) the matter will not be finally set at rest until all appeals are exhausted." Finally, Dotson asserts that the court "abused its discretion by acting more than arbitrarily in awarding such costs at this stage of the proceedings."

**{¶ 85}** This Court has previously adopted the following definition of prevailing party from Black's Law Dictionary (6 Ed. Rev. 1990) 1188:

The party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not

conduct, malice, and punitive damages.

necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered. * * * This may be the party prevailing in interest, and not necessarily the prevailing person. To be such does not depend upon the degree of success at different stages of the suit, but whether, at the end of the suit, or other proceeding, the party who had made a claim against the other, has successfully maintained it.

As used in Federal Civil Procedure Rule 54(d), which provides that costs shall be allowed as of course to [the] prevailing party unless [the] court otherwise directs, "prevailing party" means a party who has obtained some relief in an action, even if that party has not sustained all of his or her claims. * * * *Woodfork v. Jones*, 2d Dist. Montgomery No. 15841, 1997 WL 71820 (Feb. 21, 1997).

{¶ 86} "A trial court's allocation of costs cannot be reversed absent an abuse of discretion." *Id.*

{¶ 87} As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were

it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 88}** Defendants prevailed below, and we cannot conclude that the trial court abused its discretion in assessing the prevailing parties' costs to Dotson following the grant of summary judgment. We note that App.R. 24 governs the assessment of costs on appeal.

**{¶ 89}** There being no merit to Dotson's fifth assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

Frank M. Payson
T. Andrew Vollmar
Hon. Barbara P. Gorman